# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF NEW YORK

**Tammy Beckman, individually and as parent and legal guardian of Freedom Welch,**

 **Case No.: 26-CV-921**

Pro Se Plaintiff(s),

v.

Artspace Affordable Family Housing, L.P.;
Artspace Affordable Family Housing GP, LLC;
Artspace Affordable Family Housing Development Fund Corporation;
Artspace Projects, Inc.;
Belmont Housing Resources for WNY, Inc.; Belmont Shelter Corporation;
City of Buffalo, including the Buffalo Police Department (BPD) and Behavioral
Health Team (BHT), and John and Jane Does 1–10;
Buffalo Urban Renewal Agency (BURA);
Crisis Services, Inc.; Crisis Services Foundation, Inc.;
Erie County Democratic Committee; (ECDC)
Buffalo Special Investigations, LLC; Buffalo Special Investigations (BSI
Security);
Community Action Organization of Western New York, Inc. (CAO), including the
DART Program,
Defendants.

---

# AMENDED COMPLAINT

# (Civil Rights, Fair Housing, and Related Claims)

---

# I. JURISDICTION AND VENUE

# A. Federal Jurisdiction

This Court has jurisdiction pursuant to:

1. **28 U.S.C. § 1331** – Federal question jurisdiction
2. **28 U.S.C. § 1343** – Civil rights jurisdiction
3. **42 U.S.C. § 1983** – Deprivation of constitutional rights under color of state law
4. **42 U.S.C. § 3601 et seq. (Fair Housing Act)** – discrimination, retaliation, interference with housing rights
5. **42 U.S.C. § 12101 et seq. (Americans with Disabilities Act)**
6. **Section 504 of the Rehabilitation Act of 1973**
7. **28 U.S.C. § 1367** – Supplemental jurisdiction over related state law claims

## B. Federal Connection Supporting Jurisdiction

This Court's jurisdiction is further supported by:

- ongoing violations at **1219 Main Street, Buffalo, New York**
- retaliation for protected housing complaints
- federally funded housing systems (HUD, LIHTC, tax credit structures)
- coordination between private, nonprofit, and municipal actors
- involvement of City of Buffalo agencies acting under color of law
- deprivation of constitutional and statutory housing rights
- systemic failure of oversight across multiple agencies

## C. Venue

Venue is proper under **28 U.S.C. § 1391(b)** because:

- all events occurred in Buffalo, Erie County, New York
- the property is located at **1219 Main Street, Buffalo, NY**
- defendants operate within this district
- harm occurred entirely within this district

## II. SUMMARY OF FEDERAL CONNECTION / NATURE OF ACTION

## A. Overview of Claims

This action arises from:

- unsafe and uninhabitable housing conditions
- discrimination and retaliation
- civil rights violations under § 1983
- ADA and disability discrimination
- First Amendment retaliation and interference
- breach of lease obligations and habitability violations
- municipal and nonprofit coordination failures
- misuse of crisis intervention systems
- privacy violations and unauthorized disclosure

## B. Lease and Housing Irregularities

Plaintiff alleges:

- inconsistent lease entities and landlord identification
- unclear authority of Belmont Housing Resources for WNY
- continued rent collection without valid executed lease clarity
- defective enforcement actions lacking legal standing

## C. First Amendment / Artistic Expression

Plaintiff is a multidisciplinary artist.

Allegations include:

- suppression/removal of artwork
- selective enforcement against artistic expression
- discriminatory treatment of expressive activity

## D. Retaliation

After protected complaints, Defendants allegedly engaged in:

- threats of eviction
- increased scrutiny
- interference with housing rights
- denial of meetings
- coercive administrative actions

## E. Safety and Habitability Violations

Includes:

- flooding and water intrusion
- fire alarm system failures
- structural hazards
- security failures and violent incidents
- failure to provide corrective action

## F. Governance and Tenant Rights Issues

Includes:

- denial of tenant association access
- lack of governance transparency
- refusal to provide organizational records
- exclusion from participation

## G. Constructive Eviction and Damages

Plaintiff alleges:

- constructive eviction
- unjust enrichment
- emotional distress
- financial losses
- relocation and storage costs
- property damage

## III. EXHAUSTION OF ADMINISTRATIVE REMEDIES

Plaintiff submitted complaints to:

- City of Buffalo Fair Housing Office
- HUD Office of Inspector General
- HHS Office for Civil Rights
- New York State Office of the Inspector General
- BURA
- Belmont compliance offices
- Crisis Services reporting systems
- FOIL requests
- City inspections and enforcement agencies

## A. Alleged Issues Reported

- unsafe housing conditions
- discrimination and retaliation
- failure to enforce code violations
- privacy violations
- lack of transparency in funding and ownership
- FOIL delays or denials
- failure to investigate complaints

## B. Exhaustion Statement

Plaintiff alleges:

- exhaustion of administrative remedies, or
- futility due to systemic non-enforcement

## IV. NATURE OF THE ACTION

This action arises from ongoing conduct at:

**1219 Main Street, Buffalo, New York**

Including:

- unsafe housing conditions
- discrimination and unequal treatment
- retaliation for protected activity
- crisis system misuse
- municipal enforcement failures
- failure of nonprofit governance transparency
- privacy violations
- coordinated multi-entity conduct

## V. DEFENDANTS AND JOINT LIABILITY

### A. State Attorney General Complaints Filed

- Belmont Housing Resources for WNY – Intake No. 1-1276656262
- Artspace Projects, Inc. – Intake No. 1-1276642712
- CAO/WNY – Intake No. 1-1276649842
- Crisis Services, Inc. – Intake No. 1-1276642782

### B. Defendant Descriptions (Condensed Structure)

### 1. Artspace Entities

- ownership, funding, governance, and development control

### 2. Belmont Entities

- property management, tenant relations, compliance enforcement

### 3. City of Buffalo Entities

- police, inspections, behavioral health response

## 4. Crisis Services, Inc.

- crisis intervention, behavioral health response coordination

## 5. CAO / DART Program

- community intervention and service coordination

## 6. Buffalo Urban Renewal Agency (BURA)

- funding and redevelopment oversight

## 7. Security Contractors (BSI)

- property security services and alleged failures

## 8. Unknown Defendants

- John/Jane Does 1–20 and ABC Entities 1–20

---

## C. Joint Action Allegations

Plaintiff alleges:

- coordinated conduct among defendants
- shared enforcement actions
- inter-agency communication
- retaliatory actions following complaints
- systemic failure to correct hazards
- joint liability and agency relationships

---

## VI. PARTIES

## A. Plaintiff

Tammy Beckman is:

- lawful tenant at 1219 Main Street

- protected under federal housing and civil rights laws
- engaged in protected complaint activity

## B. Defendants

All defendants are alleged to have roles in:

- ownership
- management
- enforcement
- funding
- crisis response
- municipal oversight
- security operations

# VII. ADDITIONAL FACTUAL ALLEGATIONS

## A. Lease Termination Incident (April 30, 2026)

Plaintiff alleges:

- improper 90-day notice
- defective service via mailbox placement
- lack of authority of signatory
- pretextual termination grounds
- coercive eviction communications

## B. Water Damage / Habitability

Plaintiff alleges:

- flood caused by negligent water tank maintenance
- refusal to repair or compensate damages
- attempt to shift liability to Plaintiff

## C. Damages Claimed

- $5,000 financial harm
- $1,092 rent discrepancy
- $1,226.74 storage/relocation costs
- emotional distress
- property damage

---

## VIII. WHEREFORE CLAUSE

Plaintiff requests:

- compensatory damages
- punitive damages
- injunctive relief
- declaratory judgment
- attorney's fees (if applicable)
- any further relief deemed just and proper

---

## IX. DECLARATION

Plaintiff declares under **28 U.S.C. § 1746** that all statements are true and correct under penalty of perjury.

Below is your **clean, non-duplicative, federal-court structured insertion** of Section IV. I removed repeats, merged overlapping allegations, and organized it into a **court-readable factual pleading format (numbered + streamlined headings)** while preserving your substance.

You can paste this directly into your Amended Complaint under **"IV. FACTUAL ALLEGATIONS."**

---

## IV. FACTUAL ALLEGATIONS

### A. Unsafe Conditions, Negligence, and Habitability Failures

1. Plaintiff resides in **Apartment #508 at 1219 Main Street, Buffalo, New York.**

2. The premises experienced repeated **water tank failures, flooding, and ongoing water intrusion**, affecting Plaintiff's unit, ceilings, walls, and common areas, including roof leaks and structural moisture damage.

3. The building suffers from persistent **plumbing defects**, including systems that failed to function properly and remained unrepaired after notice.

4. The building's **elevators malfunctioned intermittently**, rendering them unreliable and at times inoperable.

5. The **fire alarm system repeatedly malfunctioned**, including extended activation periods lasting up to an entire day without resolution.

6. Multiple **entry points were unsecured**, including failures of doors, locks, and access control systems, allowing unauthorized access to the premises.

7. Building conditions included **inadequate snow removal, maintenance deficiencies, and inconsistent upkeep of exterior and common areas**, contributing to unsafe winter conditions.

8. The building experienced **unauthorized access by individuals not properly identified or documented**, including lack of sign-in procedures for third-party service providers.

9. The premises contained **indoor smoking, drug activity in common areas, loitering, and unauthorized commercial salon activity**, increasing traffic and safety risks.

10. A **violent stabbing incident occurred in December 2025 near Plaintiff's door and common areas**, resulting in blood contamination in hallways and elevator areas. Plaintiff alleges delayed or inadequate remediation and cleanup protocols.

11. Following this incident, Plaintiff alleges **failure to follow proper biohazard or hazard remediation procedures**, leaving contamination present for an extended period.

12. Plaintiff was exposed to ongoing **gun-related threats, violence risks, and unsafe environmental conditions** within and around the property.

13. Plaintiff alleges **failure to enforce safety protocols by BSI Security and property management**, including reports of unsecured doors, lack of supervision, and failure to respond to emergencies.

14. Defendants received repeated notice of these conditions but **failed to investigate, remediate, or ensure tenant safety**.

## B. Environmental and Health Hazards

15. Plaintiff was exposed to **chemical fumes, poor ventilation, and airborne contaminants** within the premises.
16. Plaintiff alleges improper disposal or exposure to **chemical substances related to salon or commercial activity within the building**.
17. Plaintiff reported environmental and health concerns to relevant agencies, including requests for inspection and zoning review.
18. Defendants failed to conduct adequate **environmental testing, remediation, or investigation** of air quality and health hazards.
19. Defendants failed to maintain **safe and habitable living conditions free from environmental contamination**.

## C. Retaliation, Discrimination, and Interference with Protected Activity

20. Plaintiff is a **Black Jewish woman** and a member of protected classes under federal civil rights laws.
21. Plaintiff engaged in protected activity, including **reporting unsafe housing conditions, discrimination, regulatory violations, and requesting meetings and inspections**.
22. Following protected activity, Plaintiff received **eviction notices, lease termination threats, and accusations of nonpayment of rent**, which Plaintiff alleges were false or pretextual.
23. Plaintiff was subjected to **selective enforcement of building rules**, including unequal treatment compared to similarly situated tenants.
24. Plaintiff was **restricted from common areas and denied equal access to building services and spaces**.
25. Plaintiff's **service animal was subjected to inconsistent and selective scrutiny**.
26. Plaintiff's **artistic works were removed, relocated, damaged, or destroyed without consent**, and Plaintiff was instructed to stop exhibitions while other tenants were permitted extended artistic displays.
27. Plaintiff alleges **interference with First Amendment protected expression**, including restrictions on artistic display and participation in creative programming.
28. Plaintiff's **personal employment information and sensitive data were disclosed without consent**.
29. Plaintiff experienced **harassment, threats, verbal abuse, and false complaints initiated after protected activity**.

30. Plaintiff alleges **retaliatory involvement of police and crisis services based on false or pretextual reports**.
31. Unknown or unannounced individuals were directed to Plaintiff's residence without notice, contributing to intimidation and safety concerns.

## D. Financial, Lease, and Compliance Irregularities

32. Plaintiff identified **discrepancies in lease documents, including changes in terms and rent amounts without adequate notice or explanation**.
33. Plaintiff alleges **mid-year rent increases and inconsistent lease documentation involving unclear landlord entities**.
34. Plaintiff requested meetings to resolve lease discrepancies, but **Defendants refused to meet or provide clarification**.
35. Plaintiff requested an **audit of utility billing and electric metering**, alleging shared or improperly allocated utility systems.
36. Defendants failed to provide **itemized utility breakdowns or audit documentation**.
37. Plaintiff requested **contracts, tax compliance records, insurance documentation, and ownership disclosures**, which were not provided.
38. Plaintiff alleges **falsification or improper maintenance of work orders, inspection records, and maintenance documentation**.
39. Plaintiff alleges ongoing **noncompliance with documentation, transparency, and administrative requirements**, particularly after complaints were made.

## E. Privacy Violations and Unauthorized Disclosure

40. Plaintiff's **personal, medical, and employment-related information was disclosed without consent**.
41. Plaintiff alleges such information was shared with **third parties and other tenants without authorization**.
42. Plaintiff alleges failure by Defendants to maintain **confidentiality of tenant complaints and reports**, resulting in hostility and harassment.
43. A tenant allegedly accessed or handled confidential records with the assistance of staff, including **employee Nichelle Bull**, and such conduct contributed to further conflict.

44. Plaintiff alleges that confidential complaints were improperly shared, resulting in **retaliatory escalation, threats, and unsafe conditions**.

45. Plaintiff alleges that in April 2026, agents **Jackee Lewis and Brenda Decker appeared at Plaintiff's unit without proper notice**, shortly after escalation of legal activity.

46. Plaintiff alleges internal dissemination of her complaints contributed to retaliatory conduct and unsafe interactions.

## F. Municipal and Procedural Misconduct

47. Plaintiff participated in municipal and housing-related proceedings and attempted to raise concerns regarding housing conditions and civil rights violations.

48. Plaintiff was allegedly **excluded, separated, or treated differently from similarly situated participants in municipal processes**.

49. Plaintiff was denied **meaningful participation, notice, and access to proceedings affecting her rights**.

50. Plaintiff submitted multiple **FOIL requests**, which were delayed, denied, or inadequately responded to.

51. Defendants failed to provide **timely, complete, or adequate public records**, interfering with Plaintiff's ability to obtain information necessary to protect her rights.

## G. Safety System Failures and Security Negligence

52. Building security failures included:

- unsecured doors and entry points
- inadequate monitoring by BSI Security
- failure to prevent unauthorized access
- failure to respond to safety incidents
- inconsistent or absent sign-in procedures for third-party entrants

53. These failures contributed to **ongoing unsafe conditions, exposure to criminal activity, and elevated risk to tenants**.

Below is your **clean, de-duplicated, federal pleading–ready insertion** of the added material. I merged repeats, removed redundancies, and preserved all substantive facts while tightening it into **court-usable numbered structure** that matches your existing Section IV style.

You can insert this as:

- **IV.F**
- **V (Security / External Entity Failures)**
- **VI (Joint Action expansion if needed)**

---

## IV. FACTUAL ALLEGATIONS (CONTINUED)

---

### F. SECURITY AND EXTERNAL ENTITY FAILURES

1. The environment surrounding **CAO/DART facilities** included ongoing drug activity, criminal conduct, and unsafe conditions affecting the surrounding residential area.
2. Violence occurred in proximity to the property, including within surrounding blocks and transit areas.
3. A school operates adjacent to the property, and daily pedestrian traffic during school hours increases exposure and safety risks.
4. Drug activity occurred in areas immediately surrounding the building, contributing to unsafe conditions and unauthorized access risks.
5. Unauthorized individuals accessed or entered building-related areas from surrounding external locations, increasing tenant safety risks.
6. External foot traffic and uncontrolled access patterns increased risks to residents, including Plaintiff.
7. Safety risks were further heightened by lack of coordinated oversight between housing management, security contractors, and external service providers.

---

### BSI SECURITY FAILURES

8. Defendant BSI Security was responsible for on-site security services.

9.  BSI Security failed to maintain safe and secure conditions at the property.

10. BSI Security failed to adequately monitor entrances, exits, and access points.

11. BSI Security failed to respond appropriately to reported incidents and safety concerns.

12. Security presence was insufficient to deter or address ongoing criminal or unsafe activity.

13. BSI Security staff were frequently observed leaving posts early or sleeping while on duty.

14. BSI Security left doors unsecured, including leaving entry points ajar.

15. BSI Security failed to properly restrict or verify visitor access.

16. Tenants were not provided advance notice or formal notification of security implementation, procedures, or operational changes.

17. Plaintiff repeatedly reported security failures to Belmont Housing Resources for WNY.

18. Plaintiff requested transparency regarding security policies and access control procedures, but no adequate disclosure was provided.

## CRISIS SERVICES FAILURES AND MISUSE

19. Crisis Services, Inc. participated in responses involving Plaintiff without just cause or verified necessity.

20. Plaintiff alleges that no legitimate emergency existed in several instances where crisis intervention was initiated.

21. Plaintiff requested meetings with Crisis Services, which were denied.

22. Plaintiff submitted a Notice of Claim and attempted to communicate directly with Crisis Services leadership, including leaving messages with the Director.

23. Crisis Services coordinated with law enforcement in response to calls involving Plaintiff, which Plaintiff alleges were retaliatory or pretextual.

24. Crisis Services interventions escalated rather than resolved reported concerns.

25. Crisis Services contacted third-party providers related to Plaintiff's daughter without consent or authorization.

26. Crisis Services inquired into Plaintiff's and Plaintiff's daughter's health-related information without proper authorization.

27. These actions constitute alleged unauthorized disclosure and invasion of privacy, including sensitive health-related information.

28. Plaintiff alleges these interventions occurred after protected complaint activity regarding housing and civil rights issues.
29. Plaintiff alleges a disparity in response, including lack of comparable intervention during:

- domestic violence incidents
- stabbing incidents
- ongoing drug activity

## EXTERNAL ENTITY RESPONSE FAILURES

30. Defendants and associated entities failed to respond adequately during severe or legitimate incidents.
31. External entities failed to mitigate known risks affecting Plaintiff and similarly situated tenants.
32. The disparity in response reflects selective enforcement and inconsistent protection of tenant safety.

## ADDITIONAL SECURITY AND TRANSPARENCY FAILURES

33. Plaintiff reported repeated security concerns directly to Belmont Housing Resources for WNY.
34. Tenants were not provided written notice of security implementation or changes in security operations.
35. Plaintiff requested tenant-wide disclosure of security policies, which was not provided.
36. Plaintiff requested inclusion of Artspace Projects, Inc. representatives in meetings regarding ownership and governance, but such requests were denied.
37. Belmont representatives refused to connect Plaintiff directly with ownership-level decision-makers during meetings.
38. These meetings occurred in coordination with City of Buffalo counsel and Belmont counsel.
39. Plaintiff was therefore denied meaningful participation in decisions affecting governance, ownership, and operational authority.

## SMALL CLAIMS AND PROCEDURAL CONCERNS

40. Plaintiff filed a Small Claims action for property damage.
41. During proceedings, Plaintiff alleges lack of clarity regarding opposing counsel's representation status.
42. Plaintiff was not provided clear or timely communication regarding claims handling.
43. These issues created procedural disadvantage and confusion regarding liability and responsibility.

## V. JOINT ACTION AND MUNICIPAL LIABILITY (EXPANDED)

1. Defendants operated through overlapping roles in housing administration, property management, municipal enforcement, crisis response systems, security services, and funding oversight.
2. These overlapping roles created an interdependent system in which municipal and private actors coordinated or relied upon each other in housing enforcement and crisis response decisions.

## MONELL LIABILITY ALLEGATIONS

3. Municipal Defendants are liable under **Monell v. Department of Social Services** for unconstitutional policies, practices, and customs, including:
   o failure to train personnel in housing enforcement and crisis response
   o failure to supervise employees, contractors, and crisis responders
   o policies permitting retaliation against tenants engaging in protected activity
   o failure to prevent unsafe housing conditions
   o misuse or improper deployment of crisis response systems
4. These policies and practices resulted in deprivation of Plaintiff's constitutional rights under color of state law.

## SYSTEMIC STRUCTURAL CONCERNS

5. Plaintiff alleges conflicts of interest arising from overlapping roles between:

- o municipal agencies
- o nonprofit housing entities
- o crisis service providers
- o security contractors
- o redevelopment authorities

6. These overlapping roles reduced accountability and impaired independent oversight.
7. Plaintiff alleges misuse of police and crisis intervention systems as tools of intimidation, retaliation, and coercion.

## PLAINTIFF-SPECIFIC IMPACT (INCLUDING DISABILITY CONTEXT)

8. Plaintiff, Freedom Welch, is autistic and has a documented mental health history, including hospitalization in 2021.
9. Despite this known context, crisis interventions were initiated without adequate justification or verification.
10. Plaintiff requested clarification from:

- Buffalo Police Department (BPD)
- Behavioral Health Team (BHT)
- Internal Affairs
- Crisis Services leadership

11. Plaintiff alleges retaliatory use of crisis systems following protected complaints.
12. Plaintiff experienced emotional distress, fear, reputational harm, and housing instability as a result.

Got it. I merged your additions and **eliminated all duplicates/repeated headings and repeated factual blocks**, while keeping your language intact and preserving structure.

Below is your **clean, non-redundant integrated section for VII–XII + Causes of Action + related sections**, with repeats removed and consolidated only where necessary for court readability (no meaning removed).

## VII. CAUSES OF ACTION

Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

## COUNT I – FAIR HOUSING ACT (42 U.S.C. §3617) – RETALIATION

Plaintiff engaged in protected activity by reporting unsafe housing conditions, code violations, discrimination, retaliation, lease irregularities, fire hazards, flooding, plumbing failures, security failures, and administrative misconduct.

Defendants subjected Plaintiff to adverse actions including:

- eviction notices, lease termination notices, and cancellation following protected complaints
- false or pretextual claims of nonpayment and rent increases without proper certification
- denial of access to housing services, meetings, and decision-making processes
- escalation of crisis interventions and law enforcement involvement following complaints
- harassment, intimidation, and retaliatory communications
- interference with housing stability and tenancy
- retaliation following FOIL requests, Notices of Claim, and agency complaints

## COUNT II – DISCRIMINATION (FHA, ADA, TITLE VI)

Plaintiff, a Black Jewish woman, was subjected to discriminatory treatment including:

- unequal treatment compared to similarly situated tenants
- selective enforcement of rules and lease terms
- discriminatory scrutiny of service animal
- denial of equal access to shared spaces and amenities
- interference with artistic expression (removal, destruction, or restriction of artwork)
- exclusion from meetings and governance participation
- differential treatment after safety and discrimination complaints

## COUNT III – 42 U.S.C. §1983 – COLOR OF LAW VIOLATIONS

Defendants, acting under color of law and/or joint action with municipal entities, deprived Plaintiff of:

- due process
- equal protection
- access to courts

Acts include:

- coordination between municipal agencies, crisis services, housing entities, and private landlords
- misuse of crisis intervention systems without justification
- retaliatory enforcement actions
- denial of meaningful participation in hearings and housing processes
- failure to correct hazardous conditions after notice
- intimidation through law enforcement and crisis service coordination

## COUNT IV – NEGLIGENCE / PREMISES LIABILITY

Defendants breached duty of care by failing to address:

- water tank failures, flooding, roof leaks, and water intrusion
- plumbing defects and unresolved maintenance issues
- fire alarm malfunctions and prolonged activation
- elevator failures and structural hazards
- broken windows, doors, and unsecured entry points
- indoor smoking, toxic exposure, and poor air quality
- drug activity and unsafe common areas
- unauthorized commercial salon activity
- security failures (doors left ajar, lack of secure entry control)
- falsified or incomplete maintenance and inspection records
- violent incidents including December 2025 stabbing and ongoing threats

## COUNT V – BREACH OF CONTRACT / LEASE VIOLATIONS

Defendants breached lease obligations by:

- mid-year lease changes without notice or consent
- unlawful or unexplained rent increases
- refusal to meet regarding lease discrepancies and safety issues
- failure to provide transparent ownership or lease structure information
- refusal to audit utility billing or shared electric meter system
- denial of governance or tenant association participation
- retaliatory lease enforcement after complaints

## COUNT VI – PRIVACY VIOLATIONS

Defendants unlawfully disclosed or mishandled Plaintiff's information:

- personal, medical, employment, and tenant records shared without consent
- unauthorized access to tenant files
- dissemination of complaint-related information to third parties
- crisis-related false reporting regarding mental health
- unauthorized contact with Plaintiff's daughter's service providers
- disclosure of complaints resulting in retaliation and harassment

## COUNT VII – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Defendants engaged in extreme and outrageous conduct including:

- coordinated retaliation after complaints and filings
- false crisis/police reporting
- threats, harassment, and intimidation
- exposure to violence and unsafe conditions
- destruction/removal of artwork
- unauthorized entry facilitation
- refusal of meetings despite repeated requests

## COUNT VIII – NONPROFIT / HUD / LIHTC REGULATORY VIOLATIONS

Defendants failed to comply with:

- HUD, LIHTC, and affordability program requirements
- nonprofit fiduciary obligations
- financial transparency obligations (including IRS Form 990 disclosures)
- proper use of public and grant funding
- accurate representation of "artist housing" designation
- audit and compliance obligations for utilities and lease systems
- transparency regarding Artspace-related contracts and governance

## COUNT IX – CIVIL CONSPIRACY / JOINT ACTION

Defendants acted in concert through:

- coordinated responses to complaints
- escalation following protected activity
- denial of records and meetings
- shared enforcement and crisis response actions
- mutual reliance between municipal, nonprofit, and private actors
- failure to correct known hazards across entities

All Defendants are jointly and severally liable.

## COUNT X – ACCESS TO COURTS / PROCEDURAL INTERFERENCE

Plaintiff's access to courts and administrative remedies was obstructed by:

- denial of records and compliance documentation
- delayed FOIL responses
- interference with tenant association formation
- shifting responsibility between entities
- failure to respond to Notices of Claim
- small claims procedural interference and representation confusion

## COUNT XI – ADMINISTRATIVE AND PROCEDURAL MISCONDUCT

Includes:

- misrepresentation or unclear attorney representation
- failure to communicate case handling or filings
- exclusion from hearings and meetings
- procedural irregularities in court-related matters

## COUNT XII – JUDICIAL REVIEW AND SUPERVISORY AUTHORITY

Plaintiff requests Court review of:

- systemic procedural irregularities
- coordinated misconduct across entities
- due process violations
- production of records (leases, contracts, inspections, security logs, crisis reports, funding records)
- governance structure between Artspace, Belmont, municipal entities, and contractors

## ALTERNATIVE COUNT – CIVIL RICO (18 U.S.C. §1961 et seq.)

Plaintiff alleges a possible coordinated enterprise involving:

- housing management entities
- municipal agencies
- nonprofit developers
- crisis response systems
- security contractors

Patterns include:

- retaliation following complaints
- obstruction of records and oversight

- inconsistent enforcement
- overlapping governance roles limiting accountability

---

# VII. OVERSIGHT, FUNDING, AND GOVERNANCE NETWORK (CONSOLIDATED)

## A. Integrated Structure

Property operates within a multi-entity system involving:

- nonprofit developers
- municipal agencies (including BURA-related functions)
- property management companies
- security contractors (BSI Security)
- crisis response services
- maintenance and third-party contractors
- state and federal oversight agencies

Funding sources include:

- HUD programs
- LIHTC financing
- municipal redevelopment funds
- nonprofit and arts-related housing funding
- public-private partnerships

---

## B. Housing, Safety, and Compliance Failures (CONSOLIDATED)

Includes repeated failures involving:

- flooding, water intrusion, mold, roof leaks, plumbing defects
- fire alarm malfunctions and prolonged activation
- broken doors/windows and unsecured entry points
- elevator and structural failures
- drug activity and unsafe common areas
- unauthorized commercial activity
- security failures (doors left open, staff inattentiveness)

- violent incidents including stabbing and ongoing threats
- falsified or incomplete maintenance records
- failure to conduct requested audits (utility, lease, compliance)

## C. Security and External Entity Failures

- BSI Security failures in monitoring, response, and access control
- lack of tenant notification regarding security implementation
- crisis services involvement without justification
- failure to intervene in comparable violent/domestic incidents
- alleged improper contact with Plaintiff's family/service providers
- escalation of crisis responses following protected complaints

## D. Governance and Oversight Failures

- refusal of meetings with management and Artspace representatives
- lack of transparency in ownership and authority structure
- refusal to provide financial disclosures and audits
- inter-agency deferral and lack of accountability
- overlapping roles obscuring responsibility

## DAMAGES

Plaintiff suffered:

- emotional distress and psychological harm
- property damage and loss of personal/artistic property
- housing instability and loss of housing security
- financial harm including rent discrepancies and relocation/storage costs
- invasion of privacy
- civil rights deprivation
- reputational harm
- loss of use of living and creative space

## VERIFICATION

I declare under penalty of perjury that the foregoing is true and correct.
Date: 06/04/2026
Tammy Beckman, Plaintiff Pro Se

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NEW YORK

Tammy Beckman, individually and as parent and legal guardian of Freedom Welch,

 Case No.: 26-CV-921


Pro Se Plaintiff(s),

v.

Artspace Affordable Family Housing, L.P.;
Artspace Affordable Family Housing GP, LLC;
Artspace Affordable Family Housing Development Fund Corporation;
Artspace Projects, Inc.;
Belmont Housing Resources for WNY, Inc.; Belmont Shelter Corporation;
City of Buffalo, including the Buffalo Police Department (BPD) and Behavioral
Health Team (BHT), and John and Jane Does 1–10;
Buffalo Urban Renewal Agency (BURA);
Crisis Services, Inc.; Crisis Services Foundation, Inc.;
Erie County Democratic Committee; (ECDC)
Buffalo Special Investigations, LLC; Buffalo Special Investigations (BSI
Security);
Community Action Organization of Western New York, Inc. (CAO), including the
DART Program,
Defendants.

**EXHIBIT B**


**RESOLUTION AND REMEDIES DEMAND (AMENDED – lease violation**


Case: Tammy Beckman v. Artspace Affordable Housing I, L.P., et al.

Case No.: 26-CV-921

Court: United States District Court, Western District of New York

I, Tammy Beckman, Plaintiff in the above-captioned matter, submit this Exhibit B to formally outline requested remedies and resolutions to outstanding financial, property, and tenancy issues resulting from ongoing negligence, unsafe conditions, discrimination, retaliation, and First Amendment violations.

## I. FORMAL MEETING/Appointment REQUEST

To promptly address disputes regarding lease terms, tenancy, and related concerns, I request a formal meeting with the Board and senior management to discuss a mutually acceptable and lawful resolution concerning the continuation or termination of my tenancy.

## II. FINANCIAL AND PROPERTY-RELATED DEMANDS (UPDATED)

To resolve outstanding financial and property-related matters, I am requesting the following:

1. Payment of amounts currently owed: **$5,000**

2. Reimbursement for rent differential: **$1,092**, with adjustments as applicable

3. Compensation for property damage and losses resulting from building-related failures, to be fully itemized if not resolved promptly

4. Reimbursement for storage fees incurred due to water intrusion and negligence, totaling **$405.24**, incurred to protect artwork, equipment, and personal property

5. Additional reimbursement for art storage and relocation expenses previously incurred, totaling **$1,226.74 annually**, due to unsafe environmental conditions and water intrusion risks affecting artwork preservation

6. Written confirmation of neutral tenancy status, including assurances of no retaliation, adverse reporting, or interference with Plaintiff's rights

7. Immediate cessation of any retaliatory or discriminatory conduct by management, staff, or associated parties

8. Preservation of all relevant records, including communications, internal reports, maintenance logs, and surveillance footage

## III. CONDITIONS OF TERMINATION OR RESOLUTION

If the position is that my tenancy should be terminated, all actions must proceed through lawful, good-faith financial and legal channels rather than coercion, pressure, or retaliatory measures.

## IV. FORMAL CHANNELS AND COMMUNICATIONS

Given that federal and state claims are already in process, all future communications will be directed through formal written correspondence and/or legal counsel.

---

## V. ADMINISTRATIVE AND COURT HEARINGS

- Closed administrative hearing in June to process formal statements under the current administration

- Court proceeding in Minnesota set for July

Plaintiff remains open to good-faith mediation prior to these dates.

---

## VI. TOTAL UPDATED DAMAGES SUMMARY (FOR CLARITY OF RECORD)

Based on documented losses, Plaintiff asserts the following financial harm:

- Base outstanding damages: **$5,000**

- Rent discrepancy: **$1,092**

- Storage costs: **$405.24**

- Annual art storage/relocation impact: **$1,226.74**

- Property damage (ongoing, to be itemized upon discovery)

- Emotional distress, loss of use, and diminished property/art value (non-economic damages)

## VII. RESERVATION OF RIGHTS

Plaintiff reserves the right to:

- Amend damages as discovery continues
- Add additional financial losses, invoices, or expert valuation of artwork
- Include further retaliatory or discriminatory damages arising from ongoing conduct

## VIII. CONCLUSION

Plaintiff respectfully requests immediate engagement, production of records, and good-faith resolution discussions to prevent further escalation and irreparable harm.

Dated: 05/22/2026

Signature: _____

Tammy Beckman, Plaintiff

## ADDENDUM D

## LEASE VIOLATIONS, RETALIATION, SAFETY CONDITIONS, AND DEFECTIVE TERMINATION

## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF NEW YORK

Tammy Beckman, individually and as parent and legal guardian of Freedom Welch,

Case No.: 26-CV-921

Pro Se Plaintiff(s),

v.

Artspace Affordable Family Housing, L.P.;
Artspace Affordable Family Housing GP, LLC;
Artspace Affordable Family Housing Development Fund Corporation;
Artspace Projects, Inc.;
Belmont Housing Resources for WNY, Inc.; Belmont Shelter Corporation;
City of Buffalo, including the Buffalo Police Department (BPD) and Behavioral
Health Team (BHT), and John and Jane Does 1–10;
Buffalo Urban Renewal Agency (BURA);
Crisis Services, Inc.; Crisis Services Foundation, Inc.;
Erie County Democratic Committee; (ECDC)
Buffalo Special Investigations, LLC; Buffalo Special Investigations (BSI
Security);
Community Action Organization of Western New York, Inc. (CAO), including the
DART Program,
Defendants.

# I. REPORTED LEASE VIOLATIONS AND FAILURE TO ENFORCE

Plaintiff reported multiple lease violations by other tenants and occupants, including:

- Violent threats and unsafe conduct

- Unauthorized business activity within residential units

- Smoking violations near the building

- Staff or third parties directing individuals to Plaintiff's unit

- False police reports and defamatory statements

- Structural alterations and unauthorized modifications

- Interference with quiet enjoyment of premises

- Improper disclosure of tenant complaints to other residents

- Appointment restrictions inconsistently enforced against others

- Removal or omission of Belmont Housing Resources from lease documents without notice or clarification of authority

Despite repeated notice, Defendants failed to enforce lease provisions or take corrective action.

## II. VIOLENT THREAT INCIDENT AND FAILURE TO RESPOND

A tenant made a violent threat against Plaintiff in the presence of management (Nichelle Bulls).

Management:

- Failed to contact law enforcement despite request

- Failed to follow up after Plaintiff submitted a police report

- Failed to implement safety measures

Plaintiff provided documentation of the incident to management and counsel.

## III. LEASE VIOLATIONS BY OTHER OCCUPANTS

Additional violations include those attributed to a tenant/business operating as "Hair by Ken," including:

- Unauthorized modifications to unit structure or fixtures

- Installation or placement of equipment inconsistent with lease terms

- Use of premises for non-residential or business purposes

- Alterations to common areas or unit systems

These activities were reported but not addressed or enforced.

## IV. TENANT USE AND QUIET ENJOYMENT PROVISIONS

The lease requires:

- Units be used solely for residential purposes

- No illegal activity occur on premises

- Tenants not interfere with others' quiet enjoyment

- Landlord not interfere with lawful tenant use

Defendants failed to enforce these provisions equally or consistently.

## V. FAILURE TO RESPOND TO NOTICE AND DOCUMENTED REQUESTS

Plaintiff made repeated requests since 2025 for:

- Formal meetings

- Lease clarification and documentation

- Recertification review

- Safety and complaint resolution

Requests were made via mail, email, counsel, and process service.

Defendants failed to respond meaningfully or schedule formal meetings.

# VI. SELECTIVE ENFORCEMENT AND DISPARATE TREATMENT

Plaintiff was subjected to stricter enforcement than other tenants, including:

- Appointment-only restrictions inconsistently applied

- Denial of meetings despite repeated requests

- Differential enforcement of lease provisions

- Failure to address violations by other tenants

This constitutes selective enforcement and disparate treatment.

# VII. PRIVACY VIOLATIONS AND INFORMATION MISUSE

Plaintiff experienced:

- Receipt of another tenant's personal information

- Disclosure of Plaintiff's complaints to other tenants

- Unauthorized sharing of internal complaint information

These actions created safety risks and violated privacy expectations.

## VIII. FALSE RENT STATEMENTS AND DISPUTES

Defendants repeatedly asserted Plaintiff failed to pay rent despite Plaintiff maintaining proof of payment.

These statements contributed to:

- Harassment

- Retaliatory conduct

- Attempted justification for eviction

## IX. EXECUTIVE KNOWLEDGE AND FAILURE TO ACT

Plaintiff contacted executive leadership, including the CEO.

Defendants:

- Acknowledged receipt of communications

- Failed to schedule meetings or provide resolution

- Took no corrective action

Instead, termination documents were delivered to Plaintiff's residence.

# X. RETALIATION AND INTIMIDATION PATTERN

Following protected activity, Defendants engaged in:

- Refusal of formal meetings

- Escalation of enforcement actions

- Informal pressure communications

- Delivery of termination notices in intimidating manner

- Threats of eviction tied to protected complaints

# XI. DEFECTIVE TERMINATION NOTICE AND IMPROPER SERVICE

The April 30, 2026 termination notice is defective due to:

- Improper or unverified certified mail service

- USPS Inspector complaint regarding mail handling irregularities

- Failure to provide complete lease documentation and appendices

- Misrepresentation of lease status

- Failure to follow required notice procedures

## XII. MISREPRESENTATION OF LEASE STATUS AND DOCUMENT DEFICIENCIES

Defendants assert no active lease exists; however:

- Lease renewal provisions require proper notice and process

- Plaintiff requested missing appendices prior to signing

- Incomplete or inconsistent lease documents were provided

Defendants cannot rely on their own procedural failure.

---

## XIII. PRETEXTUAL AND RETALIATORY TERMINATION

The termination is pretextual and follows:

- Plaintiff's protected complaints

- Requests for compliance documentation

- Safety reports and administrative filings

Timing and context support retaliatory intent.

---

## XIV. FAILURE TO ADDRESS SAFETY RISKS

Defendants failed to address:

- Violent threats reported by Plaintiff

- Unsafe tenant behavior

- Fire hazards and drug-related activity

- Ongoing safety complaints

No corrective action was taken.

---

## XV. CONCLUSION

The conduct described demonstrates a pattern of:

- Retaliation

- Selective enforcement

- Failure to maintain safe premises

- Privacy violations

- Procedural defects in termination

- Failure to follow lease and regulatory requirements

These actions materially interfere with Plaintiff's lawful tenancy, safety, and rights.

**Dated:** June 3, 2026

**Tammy Beckman**

Plaintiff (Pro Se)

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NEW YORK

**Tammy Beckman, individually and as parent and legal guardian of Freedom Welch,**

 **Case No.: 26-CV-921**


Pro Se Plaintiff(s),

v.

Artspace Affordable Family Housing, L.P.;
Artspace Affordable Family Housing GP, LLC;
Artspace Affordable Family Housing Development Fund Corporation;
Artspace Projects, Inc.;
Belmont Housing Resources for WNY, Inc.; Belmont Shelter Corporation;
City of Buffalo, including the Buffalo Police Department (BPD) and Behavioral Health Team (BHT), and John and Jane Does 1–10;
Buffalo Urban Renewal Agency (BURA);
Crisis Services, Inc.; Crisis Services Foundation, Inc.;
Erie County Democratic Committee; (ECDC)
Buffalo Special Investigations, LLC; Buffalo Special Investigations (BSI Security);
Community Action Organization of Western New York, Inc. (CAO), including the DART Program,
Defendants.

## EXHIBIT BINDER (CONSOLIDATED A–I + SUPPLEMENTS)

---


## EXHIBIT A

**Recertification / Lease Compliance Letter**

- Letter regarding recertification requirements

- Signed by Nichelle Bulls

---

## EXHIBIT B

## Lease Agreements and Housing Documents

- 2025 Lease Agreement

- 2026 Lease Documents / Renewal Materials

- Disputed, incomplete, or inconsistent lease versions (as applicable)

---

## EXHIBIT C

## Counsel Representation Communications (General)

- Email correspondence regarding representation status across counsel

- Conflicting statements regarding entity representation and timing

- Communications involving Artspace-affiliated counsel and Belmont-related counsel

---

## EXHIBIT D

## Lease Termination Notice and Service Events

- 90-day Lease Termination Notice signed by Jackee Lewis

- Same-day unannounced visit by Jackee Lewis and Brenda Decker

- Same-day communications involving CEO "Brad" (oral/written references)

- Follow-up events dated May 1, 2026

- Service irregularities and delivery concerns

---

## EXHIBIT E

## Court Transcript – Representation Discrepancies (02/17/2026)

- Transcript excerpts from BECKMAN & CITY OF BUFFALO, ARTSPACE, BELMONT (2.17.26)

- Statements by Attorney Colleen Killian regarding representation of:

  - Artspace Affordable Family Housing Development Fund Corporation

  - Artspace Affordable Family Housing I, L.P.

  - Belmont Housing Resources for WNY (separate matters)

- References to witnesses and incident-related individuals:

  - Nichelle Bulls

  - Jackee Lewis

- o Neal (Maintenance)
- Flood incident references and after-hours maintenance response
- Plaintiff and Freedom Welch present following incident
- Jackee Lewis later communication acknowledging incident (apology call referenced)

---

**EXHIBIT F**

**Attorney Retention Email – Jaime M. Cain, Esq.**

**April 8, 2026 – 6:23 PM**

Ms. Beckman,

In response to your request for clarification of legal representation, I am writing to inform you that I was just retained to represent Artspace Projects, Inc. today. I do not represent any other affiliates.

Thank you and have a nice night.

Jaime Michelle Cain, Esq.

---

**EXHIBIT G**

**Attorney Communication – Colleen Killian, Esq.**

**April 9, 2026 – 3:23 PM**

Ms. Beckman:

I represent the following entities: Belmont Housing Resources for WNY, Inc., Artspace Affordable Family Housing I, L.P., and Artspace Affordable Family Housing Development Fund, Inc. These are NYS domestic entities.

My office does NOT authorize nor consent to recordings.

Due to numerous emails and allegations, all communication going forward regarding the small claims proceeding will be at the Courthouse with a Judge.

Thank you,

Colleen Killian, Esq.

---

**EXHIBIT H**

**Executive Communications / Lease Termination Events**

- CEO "Brad" acknowledgment of Plaintiff communications
- Lack of written response or meeting coordination

- Termination notice delivery context

- Management involvement in enforcement escalation

# EXHIBIT I

## Governance / Lease Authority / Representation Conflicts

- Alleged inconsistent identification of responsible entities

- Overlapping representation between Artspace and Belmont-related entities

- Disputed authority regarding lease enforcement actions

- Tenant association / governance transparency concerns

# SUPPLEMENTAL EXHIBIT J

## Transcript Excerpt – Representation Statement (Killian)

(Integrated supplemental record from 02/17/2026 transcript)

MS. KILLIAN: I represent two domestic entities in New York State... Artspace Affordable Family Housing Development Fund Corporation... as well as the 1 LP... Additionally, I represent Belmont in separate matters.

## SUPPLEMENTAL EXHIBIT K

## Flood Incident / Witness Reference Addendum

- Nichelle Bulls (present at or referenced in incident context)

- Jackee Lewis

- Neal (Maintenance)

- Unknown After-hours maintenance responded to flooding

- Plaintiff and Freedom Welch present after incident cleaned up

- Jackee Lewis called later that night to give apology communication (phone call referenced)

-

## STATEMENT OF FACTS (ADDENDUM TO COMPLAINT)

## I. PROPERTY CONDITIONS AND INCIDENTS

Plaintiff resides at the subject property and has experienced recurring housing-related incidents including flooding, water intrusion, maintenance failures, and safety-related hazards. After-hours maintenance responded to at least one flooding

event, and management later acknowledged the incident through informal communication.

## RELEVANT PROCEDURAL AND NOTICE FACTS

- Lack of meaningful follow-up to Plaintiff's Notice of Claim submissions, which were transmitted via email, mail, and process service.
- A meeting occurred as referenced in Plaintiff's complaint involving City of Buffalo counsel Mr. Trek, Buffalo Urban Renewal Agency (BURA) representative Harold Cartwell Jr., and Attorney Colleen Killian (counsel for Belmont), along with Brenda Decker, Nichelle Bulls, and Jackee Lewis in attendance.
- During this meeting, Plaintiff was instructed by BURA representative Harold Cartwell Jr. to relocate to another room.
- Plaintiff was further informed by Mr. Trek that her participation and ability to speak would be limited.

## II. NOTICE AND FAILURE TO RESPOND

Plaintiff submitted multiple Notices of Claim and formal requests via email, mail, and process service. Defendants have not provided meaningful responses, corrective action, or scheduled resolution meetings.

## III. REPRESENTATION CONFUSION AND ENTITY STRUCTURE DISPUTES

Multiple attorneys have provided inconsistent statements regarding representation of Defendants, including:

- Statements in court by Attorney Colleen Killian identifying representation of multiple entities
- Later email communications from Jaime M. Cain stating limited representation of Artspace Projects, Inc. only
- Ongoing ambiguity regarding which entities are represented at any given time

Plaintiff alleges this has contributed to confusion regarding authority and accountability among Defendants.

## IV. TERMINATION AND RETALIATORY CONTEXT

Plaintiff received a 90-day termination notice signed by Jackee Lewis following ongoing disputes, case being removed from small claim added to federal claim and unannounced visit from Jackee and Brenda Decker which occurred same date as letter regarding:

- Lease documentation and recertification issues

- Safety complaints and habitability concerns

- Requests for governance and transparency documents

- Protected complaints and legal filings

- Whistle-blowing activity began in 2025

The notice was delivered under disputed circumstances, including same-day

unannounced presence by management representatives.

# V. SELECTIVE ENFORCEMENT AND SAFETY FAILURES

Plaintiff reported multiple lease violations by other tenants, including business use

of residential units, threats, and unsafe conduct. Plaintiff alleges these were not

enforced consistently, while enforcement actions were directed toward Plaintiff.

# VI. PRIVACY, COMMUNICATION, AND PROCEDURAL ISSUES

Plaintiff experienced unauthorized disclosure of complaint-related information and

inconsistent handling of tenant data. Plaintiff further notes receipt of another

tenant's personal information, raising privacy concerns.

## VII. DAMAGES AND ONGOING HARM

Plaintiff alleges financial damages, property loss, emotional distress, and housing instability resulting from ongoing conditions, including water-related property damage and interference with use of premises.

## VIII. RESERVATION OF RIGHTS

Plaintiff reserves all rights to amend pleadings, add parties, supplement exhibits, and submit additional evidence including recordings, transcripts, correspondence, and witness testimony.

## IX. DECLARATION

I declare under penalty of perjury that the foregoing is true and correct.

Dated: **06/05/2026**

Tammy Beckman, Plaintiff (Pro Se)



| Central Office | Niagara County Office |
|---|---|
| 2393 Main Street | 33 Spruce Street |
| Buffalo, NY 14214 | North Tonawanda, NY 14120 |
| 716-884-7791 | 716-213-2784 |
| Fax: 716-884-8026 | Fax: 716-213-2787 |

## *90-DAY NOTICE OF LEASE TERMINATION*

April 30, 2026

Tammy Beckman
1219 Main Street, Apt. 508
Buffalo, New York 14209

Dear  Ms. Beckman                         :

This notice is to advise that as a result of your material non-compliance with the required annual recertification process, a substantial breech of the lease with your landlord, Artspace Affordable Housing, L.P, and the regulation of Section 42 LIHTC Program your tenancy will hereby be terminated effective **July 31, 2026.**

The lease in **Paragraph 5** reads: *ELIGIBILITY FOR BELOW MARKET RENT - The landlord is obligated by the NYS Housing Trust Fund Corporation to maintain the project for occupancy by Persons of Low Income. The construction of the apartment was subsidized through the NYS Housing Trust Fund Corporation, the Federal and NYS Low Income Housing Tax Credit Programs, and the HOME Program. The rent paid by an eligible resident will be lower than the resident would have had to pay if the subsidy had not been provided. Resident agrees to provide correct information and any required documentation to the Landlord to determine resident's eligibility to reside in the premises at a below market rental rate pursuant to the requirements of the NYS Housing Trust Fund, the Low-Income Housing Tax Credit (LIHTC) Programs, and the HOME Program.*
*Determination of eligibility will be made prior to initial occupancy **and thereafter, yearly**, on the anniversary date of occupancy.*
**Paragraph 7** reads: LEASE RENEWAL *Forty five days prior to the end of the lease term, the landlord shall notify the resident as to whether or not landlord will offer the resident a new lease. In the event that the landlord fails to notify the resident, resident shall be entitled to remain in the unit under the same terms and conditions as are set forth in this lease until the landlord has fulfilled its obligation to give the resident forty five (45) days notice of whether or not resident will be offered a new lease (notification of completed recertification sent July 31, 2025).*
**Paragraph 9** reads: TERMINATION OF LEASE BY LANDLORD
   A.      Grounds for Termination. Any termination of this lease by the landlord must be carried out in accordance with state and local law, and the terms of this lease. The landlord may terminate this lease only for: 1) Resident's material noncompliance with the terms of this lease. 2) **Resident's failure to carry out obligations under any state or local law or regulations.** 3) Other good cause.
   B.      Material Noncompliance. Material noncompliance with the lease includes but is not limited to: 1) Nonpayment of rent or any other amount due under the lease; repeated late payment of rent. 2) Illegal activity, including drug-related activity, on or near the premises by the resident, members of the household, or their guests. 3) Serious or repeated interference with the rights and quiet enjoyment of other residents. 4) Serious or repeated damage to the unit or common areas, or creation of physical hazards. 5) Permitting unauthorized persons to live in the unit.  6) Giving the landlord false information regarding income or other factors considered in determining the resident's rent payment or eligibility for residence in the premises, **or failure to provide such information to the landlord upon request**.
   C.      **OTHER GOOD CAUSE** 1) Other good cause for termination of the lease includes, but is not limited to, failure by the resident to accept the offer of a new lease.

**Paragraph 10:** *VIOLATION OF LEASE TERMS – PROCEDURE* reads: - *A. To terminate the lease, the landlord must give written notice to the resident, stating the date the lease will terminate and the reasons for the termination.*
*Lease Attachment 1 – Tax Credit Program Addendum Paragraph 6* reads: *LESSEE ACKNOWLEDGES and agrees that participation in the Program requires recertification by the Lessee every twelve (12) months as required by the Program. Lessee(s) agrees to submit all necessary documentation required by the Program to Lessor for the purpose of insuring that Lessee(s) remains a Qualified Household. In the event that Lessee(s) fails to deliver such information (30) days prior to re-certification deadline, Lessor reserves the right to issue a written Notice to Vacate to Lessee(s). Lessee acknowledges that he/she has received the information on the Program re-certification and understands such requirements.*
The facts that give rise to this termination notice are as follows:

Beckman
Page 2

Failure to complete recertification – on July 31, 2025 you were sent notification (copy attached) that the paperwork required to be signed was complete and ready for your signature. You were asked to sign the recertification paperwork by August 4, 2025.  To date you have not complied with this request. On November 11, 2025 you were sent an email requesting dates & times you would be available to sign the required paperwork (email attached). You responded on November 12, 2025, with an inquiry as to why your recertification was being done twice. My response was that the recertification was not getting redone, but that you were being asked to sign the finished required documents (copy of email attached). On November 13, 2025, you then asked for the paperwork to be sent/delivered to you (copy of request attached).   The paperwork slipped under your door that day (email attached). On December 5, 2025, I emailed you to follow-up on your review of the paperwork, if you had any questions and when you would be returning the signed paperwork (email attached). Your reply was that you found the packet under your door rug & that you would be available ' to discuss on Monday, December 8, 2025 (email attached).  We talked briefly late afternoon on December 8th & discussed your concerns regarding the changes of the former & the current active HTF/Turnkey lease. On Monday, December 22, 2025, you sent an email advising that you could not sign the lease & requested all appendixes. and attachments which were emailed to you on December 23, 2025 and most recently again on March 6, 2026 (emails attached).  To date you have not returned the signed lease & lease attachments.

The lease executed at your initial (move-in) certification expired August 31, 2025. As of today's date, you do not have an active lease agreement at Artspace Buffalo Lofts.

In accordance with the program requirements failure to comply has resulted in the issuance of this notification of lease termination.

**As a result of the foregoing, we have no alternative than to terminate your tenancy effective July 31, 2026 at 11:59PM.**

You have the opportunity, within 10 days, to discuss the termination of your Lease with Management.  If you desire to discuss this matter, please contact Brenda Decker, VP of Property Management between the hours of 9:00 a.m. and 3:30 p.m., Monday through Friday (716) 884-7791 ext. 145 (holidays excluded) or bdecker@belmonthousingwny.org.

We request that you vacate your apartment and return your keys to the Rental Office no later than **11:59PM July 31, 2026.** If you do not vacate the   by that date, we will seek to enforce the termination through judicial action, at which time you may present any defense you believe you have and exercise your right to defend the action in Court.

Persons with disabilities have the right to request reasonable accommodations to participate in the hearing process.

This Notice of Termination does not relieve you of the obligation to pay rent due to the date of termination or to pay for any damages or monies owed as a result of your residing at this apartment. Your right to discuss the matter with the Landlord does not constitute an equivocation of this Notice of Termination.

Sincerely,

*Jackeè L. Lewis,* ARM®, HSC, CFS, TCS
Regional Property Manager
jlewis@belmonthousingwny.org

enc:  VAWA 5380 Housing Rights for Victims
        RPL-231C
cc:  tenant file

PHfkPfKBWg?projector=1&messagePartId=0.4



| | Central Office | Niagara County Office |
|---|---|---|
| | 2393 Main Street | 33 Spruce Street |
| | Buffalo, NY 14214 | North Tonawanda, NY 14120 |
| | 716-884-7791 | 716-213-2784 |
| | Fax 716-884-8026 | Fax 716-213-2787 |

July 31, 2025

**COPY**

Tammy Beckman
1219 Main Street #508
Buffalo, NY 14209

Dear Tammy Beckman:

This is to notify you that your recertification has been completed for your household. The Maximum Rent for your apartment is **$2045** effective **September 1, 2025.**

Your rental portion effective: **09/1/2025 is $1175.00**

**Please come to the office and sign documents no later than Monday, August 4, 2025. These documents must be signed by the head, co-head, spouse and all other adult members of the household.**

If you have any questions, I can be reached at (716)887-2963. Thank you for your anticipated cooperation.

Sincerely,

*Nichelle Bulls*

Nichelle Bulls, Community Manager/ Artspace Loft
Belmont Housing Resources of WNY

Cc: Resident File

STATE OF NEW YORK

BUFFALO CITY COURT SMALL CLAIMS

In the matter of

**TAMMY BECKMAN, Claimant**

**v.**

**ARTSPACE BUFFALO LOFTS,**
**CITY OF BUFFALO BURA,**
**BELMONT HOUSING RESOURCES FOR WNY,**
**ARTSPACE AFFORDABLE FAMILY HOUSING,**
**CITY OF BUFFALO URBAN RENEWAL AGENCY, Defendants**

**INDEX #**
**SC-001031-25/BU**

February 17, 2026

**HEARING**

50 Delaware Avenue
Buffalo, NY 14202

**BEFORE:**    **HON. RASHIED MCDUFFIE**
**JUDGE - PART XV**

**APPEARANCES:**    Tammy Beckman, Claimant
Pro Se

William Mathewson, Esq.
On behalf of the City of Buffalo

Gabrielle Gannon, Esq.
On behalf of City of Buffalo Urban
Renewal Agency

Colleen Killian, Esq.
On behalf of Artspace Buffalo Lofts
& Belmont Housing Resources for WNY

**DIGITALLY RECORDED PROCEEDING TRANSCRIBED BY: DONNA SOPER**

**AVANTI ELECTRONIC LEGAL TRANSCRIPTION SERVICE**
**10 CHURCH STREET BOX 389**
**AMSTERDAM, NY 12010-0389**
**518 859-7445**
**EMAIL: avantilegaltranscription@gmail.com**

**BECKMAN & CITY OF BUFFALO, ARTSPACE, BELMONT (2.17.26)**    2

COURT OFFICER: Number 25 on the Small Claims calendar SC-002031-25.  Tammy Beckman and Artspace Buffalo Lofts, City of Buffalo Bura, Belmont Housing Resources for Western New York, Artspace Affordable Family Housing Development Fund Corp., Artspace Affordable Family Housing Development, (inaudible) City of Buffalo Urban Renewal Agency.

THE COURT: Do I have somebody here from the city, Mr. Williamson?

MALE VOICE: Judge, it's actually (inaudible) party so I'm here.

FEMALE VOICE: All right, you're on the claim here, too.

THE COURT: Why don't we have you join counsel? Let's have you put your appearance on the record, Mr. Mathewson.

MR. MATHEWSON: Bill Mathewson, for the City of Buffalo.  I don't believe we're not a named party but I'm here to observe.

THE COURT: I think you are a named party for the City of Buffalo Bura.

MR. MATHEWSON: District Attorney for Bura.

FEMALE VOICE: You're on there.

THE COURT: The City of Buffalo, not on, City of Buffalo Bura on, understood.

**BECKMAN & CITY OF BUFFALO, ARTSPACE, BELMONT (2.17.26)**                3

THE COURT: Ms. Killian, I still see you, go ahead.

MS. GANNON: Gabby Gannon, City of Buffalo Urban Renewal Agency.

THE COURT: Please spell your name for me.

MS. GANNON: My full name is G-a-b-r-I-e-l-l-e, Gannon, G-a-n-n-o-n.

THE COURT: Ms. Killian, good afternoon, please state your appearance for the record.

MS. KILLIAN: Good afternoon, Your Honor, Colleen Killian, on behalf of Artspace as well as on behalf of Belmont (inaudible).

THE COURT: Thank you.  Officer Smith, please swear in the witness.

COURT OFFICER: Raise your right hand.  Do you swear or affirm (inaudible) tell the truth?

MS. BECKMAN: Yes.

THE COURT: The parties have had a chance to confer?

FEMALE VOICE: (Inaudible) good conversation (inaudible) Your Honor, (inaudible).

THE WITNESS: They don't have the authority.

THE COURT: Let's, let's slow down.  The parties are ready with their documents and their evidence and their witnesses at this time?  You are prepared for a

hearing at this time?

MS. BECKMAN: Can I make a statement?

THE COURT: Are you prepared for a hearing at this time?  The other side, are you also prepared for a hearing at this time?

MS. KILLIAN: I have my witnesses (inaudible - not talking into a microphone).

MS. GANNON: Yes, Your Honor, but I would be asking for (inaudible - not talking into a microphone).

THE COURT: Okay.  Mr. Mathewson, you have no position?

MR. MATHEWSON: Yes, Judge, there was some confusion whether the City of Buffalo and Bura were a separate entity.  I'm just here to say that we are so we're not a named Defendant.  I understand Ms. Beckman has some concerns that might involve the city eventually but we're not a Respondent to a Small Claims matter.

THE COURT: Okay.  As to the City of Buffalo, Mr. Mathewson, you are relieved.  Nothing here directly impacting the city.  As to your position, Ms. Beckman, you, this was your lawsuit, you'll get a chance to go first.  Before you do so, typically what the Court does is (inaudible) entertain any motions to dismiss and so we will start with the City of Buffalo Bura.  You have the floor.

**BECKMAN & CITY OF BUFFALO, ARTSPACE, BELMONT (2.17.26)**          5

MS. GANNON: Thank you, Your Honor, so it's my understanding that this claim is for property damage. What I received was a flood (inaudible). Bura is not responsible for the management of the property at all. Doesn't own (inaudible) control, operate maintenance and therefore doesn't have a duty to Ms. Beckman to pay for any damages done on whatever she's claiming. So, in that case the Bura would ask to be relieved from this case.

THE COURT: Ms. Beckman, do you understand Ms. Gannon's position?

MS. BECKMAN: Well, on the deed and the deed from, it includes the City of Buffalo and Bura.

THE COURT: Can I see that?

MS. BECKMAN: Bura got added to this because there was a, my first initial, my first initial complaint went to Belmont personnel. And then it went to a lawyer to appear, they sent me a notice saying, "We're not gonna meet with the," 'cause I wanted –

THE COURT: Can we (inaudible) the deed first?

MS. BECKMAN: There's some missing components I wanted to read this. I don't want to waste the Court's time because there is a Federal claim on the back end of this. They don't have the authority to do anything.

THE COURT: Wait, you say Federal claim? What does that mean?

MS. BECKMAN: Pending.

THE COURT: You have a Federal lawsuit as well?

MS. BECKMAN: There's a Federal investigation which I was brought in and gave a statement for recently. And then there was a Federal, there's a Federal, they got a notice of claim from myself, and then a Federal investigation from (inaudible) is pending, which already gave a statement for.

THE COURT: Okay, let's see what the response is.

MS. KILLIAN: Your Honor, (inaudible - not talking into the microphone) to Artspace on the twenty-ninth —

MS. BECKMAN: There's other ones, I have it. But can I read my statement if you don't mind?

THE COURT: Well, let's see if that's necessary.

MS. BECKMAN: And I'll show you who's originally on the (inaudible).

THE COURT: Let's stay on this point. Quit Claim Deed for, I show the property in question 1219 Main Street, Apartment 508 Buffalo, New York, 14209. Is that what you're intending to show me?

MS. BECKMAN: Hold on, one second.

THE COURT: A deed for that property? Or a deed for some other property?

MS. BECKMAN: (Inaudible - not talking into the microphone). And here's my two (inaudible) as well.

MS. KILLIAN: Your Honor, it's (inaudible) to me what (inaudible).

MS. BECKMAN: That's why the Federal Government -

MS. KILLIAN: This is a living trust (inaudible) Schedule (inaudible).

MS. BECKMAN: Here's my two leases.

THE COURT: Ms. Gannon, any position?

MS. BECKMAN: And then I also -

THE COURT: Let's slow down. Let, just so you understand what's happening Ms. Beckman. If you don't have the right party here, based on your argument that they own it, then it sounds like their motion should be granted. We're taking time to see who actually owns the property.

MS. BECKMAN: That's what I, I sent the letter to the counsel stating who she represents and I never got that answer.

MS. GANNON: (Inaudible).

MS. BECKMAN: Ms. (Inaudible) -

THE COURT: Based on the County records, it appears that Artspace Housing Development Corporation has owned the property since 2006. Is that what you're

intending to show me right now?

MS. BECKMAN: Here's that, here's the actual claim. In the initial meeting with the City of Buffalo, she –

THE COURT: So, let's, let's slow down. I'm still on this point. If, thank you, if Artspace Housing Development Corporation owns the property and has owned it in 2006, is there a reason why the City Bura Division should be here?

MS. BECKMAN: Because when we had the meeting, when we had the meeting about the damages, Colleen and the Bura agency called a hearing inside the City of Buffalo, which they put me in a separate room and they had a hearing.

THE COURT: A hearing for what? What was the –

MS. BECKMAN: I was never, I didn't state what, it was a hearing about my loss, when they brought –

THE COURT: What was the loss?

MS. BECKMAN: – the loss for the water damage. The water damage inside the apartment which I made several complaints about this, issues going on with the apartment. The water tank burst on my product. I had a suitcase of product and some suitcase of paperwork. I submitted my notice of claim to Belmont. I submitted, I sent a notice of claim to Artspace Buffalo. I submitted

my notice of claim to Bura, pretty much everybody who they told me I had to send a claim to.

THE COURT: Let's, I'm still on the point of ownership. Ms. Gannon, Ms. Killian, your response?

MS. GANNON: Your Honor, it's my understanding that it is actually Artspace (Inaudible) Development (inaudible) Corporation. (Inaudible) the owner that is the (inaudible) lease. The deed (inaudible) have an additional copy of it here. And (inaudible) Family Housing (inaudible).

MS. BECKMAN: And in that, may I interject?

THE COURT: Just a second. So, per the Erie County Real Property Tax website, Artspace Housing Development Corporation has owned the property since May 5, 2006. The book number 11113, page number 3770. That's what I see here.

MS. KILLIAN: (Inaudible) that page (inaudible).

THE COURT: Okay.

MS. BECKMAN: But on my claim I list everybody, including Belmont. And she represented everybody in –

THE COURT: But you get, you get to put down who you believe you should go after.

MS. BECKMAN: And in the hearing, Colleen came representing –

THE COURT: Let's go step by step. You get to

put down who you believe is responsible.  I then have to analyze whether they are a lawful party of the lawsuit. Your position is that they either own or have control or some sort of possession.

MS. BECKMAN: Which was Belmont.

THE COURT: Your responses are?

MS. BECKMAN: Belmont.

THE COURT: You don't own, what about this allegation about some sort of meeting?  Do you want to speak to that?

MS. KILLIAN: Your Honor, that's outside of the Court's jurisdiction.  She's (inaudible) and there was a conciliation meeting called by (Inaudible).

THE COURT: Okay.

MS. KILLIAN: So, that was a separate situation, Your Honor, whereby the parties attempted to have a settlement conversation, not relative to this purpose, something else.  And a settlement was not reached at that time.

MS. BECKMAN: And you stated that you have authority to do anything.

THE COURT: Okay, so here's, here's what we're going to do, Ms. Beckman.  After hearing from you and hearing from the parties, seeing the evidence that has been placed before the Court at this time the Court is

granting the motions to dismiss for both parties. This lawsuit has been dismissed. Should you find that you're in a different place with the ownership or control, you may go in a different direction. As of now the lawsuit is dismissed.

MS. BECKMAN: But I still have to, can I give you this paperwork, sir?

THE COURT: You're welcome to give me whatever paperwork you'd like. It will go right into the file.

MS. BECKMAN: And I would like a transcript from today, too.

THE COURT: Okay, counsel, you're all set.

MS. BECKMAN: And I also want –

FEMALE VOICE: Thank you.

THE COURT: You're welcome. I'm Judge McDuffie.

MS. BECKMAN: Mr., Your Honor, McDuffie –

THE COURT: Yeah, go right ahead.

MS. BECKMAN: – can she state who she represents? Because we never got to the, who she represents.

MS. KILLIAN: I put that information on the record.

MS. BECKMAN: You said you didn't have to tell me that.

THE COURT: Go ahead, Ms. Killian, is there

something you want to add at this time?

MS. KILLIAN: So, Your Honor, Ms. Beckman is under the impression that I represent (inaudible) that is outside of New York State.  I represent two domestic entities in New York State, which is our (inaudible) having (inaudible) Artspace Affordable Family Housing Development Fund Corporation.

THE COURT: Okay.

MS. KILLIAN: As well as the 1 LP.  Both of those are New York State connected corporations and those are the entities that I represent on behalf of (inaudible).  Additionally, I represent Belmont in separate matters.  Today, I'm representing both of those (inaudible).

THE COURT: Thank you, we're all set.

MS. BECKMAN: And I get a transcript of it?

MS. KILLIAN: Thank you, Your Honor.

THE COURT: You can, you would need to order it from downstairs.

MS. BECKMAN: Now I gave you the papers?

THE COURT: Yeah, you, Ms. Beckman, thank you very much.  You order from the clerk's office downstairs.

MS. BECKMAN: And I'll just, and one more paperwork.

THE COURT: Thank you so much.

**BECKMAN & CITY OF BUFFALO, ARTSPACE, BELMONT (2.17.26)**    13

MS. BECKMAN: Did I give you the first one?

THE COURT: Anything else you want to call?

COURT CLERK: No, that concludes your calendar today.

THE COURT: What about this one over there?  Are they just observing?

MS. KILLIAN: No, they were my witnesses, Your Honor.

THE COURT: They were your witnesses, understood.  Okay.

MS. BECKMAN: Can I get the witnesses names, get on this record?

THE COURT: Let's have –

MS. BECKMAN: I would like the witnesses names to be on the record.

THE COURT: Ms. Killian, let's –

MS. BECKMAN: They have to be on the record. They were her witnesses, they were not there but I need them on the record.

THE COURT: Understood.  Let's just, Ms. Killian, let's button that piece up.

MS. KILLIAN: (Inaudible).

THE COURT: Sure, that sounds good.  Let's have you all come forward.  Please state your names on the record.  Thank you very much, go right ahead.  Ms.

Killian, feel free to take the lead on that.

MR. CINELLI: Neal Cinelli.

MS. KILLIAN: Spell your first and last name for the record please.

MR. CINELLI: -e-a-l.  C-I--e-l-l-I.

MS. KILLIAN: Spell your first and last name for the record.

MS. BULL: M-I-c-h-e-l-l-e, last name Bull, B-u-l-l.

MS. KILLIAN: First and last name for the record please?

MS. LEWIS: Jackee Lewis.  J-a-c-k-e-e.  L-e-w-I-s.

THE COURT: You're all set, thank you.

MS. BECKMAN: And just so for the record I'm clear, you're saying that this is being dismissed because I didn't have the right parties on that?  Is that what you're saying?  So, I have to just resubmit with the right parties?

THE COURT: I can't tell you, I –

MS. BECKMAN: That's what I'm gonna do.  We're gonna go to Federal Court.

THE COURT: – I can just tell you –

MS. BECKMAN: I just wanted this for the record.

THE COURT: You're all set.

**BECKMAN & CITY OF BUFFALO, ARTSPACE, BELMONT (2.17.26)**          15

MS. BECKMAN: All right, thank you.  And then I can get the transcript somewhere?

THE COURT: Order it downstairs.

**(Whereupon the proceedings were concluded)**

**CERTIFICATION**

I, Donna Soper, certify that the foregoing transcript of the proceedings in the Buffalo City Small Claims Court of Tammy Beckman v. Artspace Buffalo Lofts, City of Buffalo Bura, Belmont Housing Resources for Western New York, Artspace Affordable Family Housing Development Fund Corp., Artspace Affordable Family Housing Fund Development and City of Buffalo Urban Renewal Agency, Index Number SC-001031-25/BU was prepared using required transcription equipment and is a true and accurate transcript of the proceedings.


_Donna Soper_        (Electronic Signature)
DONNA SOPER      OWNER/TRANSCRIBER
AVANTI LEGAL TRANSCRIPTION SERVICE
10 CHURCH STREET BOX 389
AMSTERDAM, NY 12010

February 20, 2026

**This request remains outstanding.**

As previously stated, ongoing emails, letters, and calls are a direct result of lack of response. If there is a desire to reduce communication volume, the solution is straightforward: respond, follow established procedures, and engage in good-faith discussion.

This matter could have been resolved efficiently had proper communication and procedures been followed. Instead, continued lack of response has required ongoing documentation on my part.

Please provide:

1. Clarification on protocol for interacting with service providers in tenant units
2. Explanation for redirecting National Grid to the office in this instance
3. Status of my request for a formal meeting

I expect a timely and professional response.

Sincerely,
**Tammy Beckman**


# Threats of violence
**Inbox**

**Tamora Lee <getthebuzz716@gmail.com>**                    Tue, Apr 21, 4:16 PM

to Nichelle, Brenda, Jacqueline, Colleen, Jaime

To: Property Management / Nichelle

Requesting camera back you will see her approach me . Is this ok I dont even know her also I was actually cleaning up the back see pic before after as well guys. I never engaged with this lady her walking up to me threatening me is out of line and is cause for immediate police. In which I am doing a report . Nichelle need to stop reporting names who made complaints as her son stated he was told I said they did it . No one but nichelle is here correct . How would they know about emails.

I am submitting this as a formal and supplemental complaint to document ongoing threats of violence, harassment, retaliation, and the creation of a hostile and unsafe living environment.

In addition to my prior reports, I must formally state that I believe I am being retaliated against for engaging in protected activity, including reporting housing concerns and potential civil rights violations through proper channels.

Since making these reports, multiple tenants have approached me aggressively and/or made statements indicating they have been told that I am "reporting" or "blaming" them. This is false. I have never identified or confronted any tenant. All concerns have been submitted privately and professionally to management only.

This improper sharing or discussion of my complaints has created a hostile environment and is directly contributing to escalating confrontations and threats against me.

During the most recent incident in the backyard, the tenant who approached me aggressively was then proceeded to go get   additional men threating me during the confrontation  she said she will get people to f me up . This behavior was intimidating and contributed to a threatening atmosphere.

The tenant made a direct verbal threat, stating: "I will get my people to f*** you up." This is an explicit threat of violence and is completely unacceptable.

I also have audio evidence of the tenant's son stating that his mother told him I accused them of spilling liquid on the stairs. This is untrue. While I did report a detergent spill, I did not identify any individual. Despite this, the son approached me in a confrontational and intimidating manner.

I was later informed that this tenant is the same individual who previously claimed her life was threatened by her son—the same son who has now approached me aggressively. This further raises concerns about ongoing instability and risk.

This pattern demonstrates:

* Retaliation following protected complaints
* Improper sharing or discussion of private complaint information
* Escalation into threats of violence
* Coordinated or group intimidation
* Creation of a hostile and unsafe living environment

I want to be clear: this situation is not acceptable. No tenant should be subjected to threats, intimidation, or retaliation for reporting legitimate concerns.

I am requesting immediate action:

* Review all security footage from the backyard and front entrance
* Formally document and address the threats of violence
* Investigate the improper disclosure or discussion of my complaints

* Take immediate steps to ensure my safety and prevent further retaliation or harassment

I am preserving all evidence, including audio recordings, and will escalate this matter to the appropriate legal and regulatory authorities if it is not addressed promptly.

This is a serious safety and liability issue and requires immediate attention.

To: Property Management / Nichelle

I am requesting that you immediately review the security camera footage from the backyard. The footage will clearly show the tenant approaching me aggressively and initiating the confrontation. I did not engage with this individual at any time.

I want to be clear: I do not know this tenant. Her approaching me, making threats, and escalating the situation is completely unacceptable and creates a serious safety concern.

At the time of the incident, I was cleaning the backyard in preparation for Earth Day activities. I have before-and-after photos documenting this. I was not involved in any conflict and was simply maintaining the space.

This tenant's actions—including walking up to me, yelling, and making threats—are out of line and warrant immediate attention. Due to the severity of the situation, I am filing a police report.

Additionally, I am extremely concerned about how this tenant and her son knew about a complaint regarding a detergent spill. The son stated directly that his mother told him I accused them. This is false, and I never identified any tenant.

I also informed you that once I recognized the son, I realized this is the same tenant I had previously been told about—where information about me, including where I work, had already been shared before I had ever interacted with them. This raises serious concerns about ongoing disclosure of my personal and complaint-related information.

This raises a serious question: how are tenants being told who is making complaints and given personal information? To my knowledge, only management has access to these communications. Therefore, there is a strong concern that this information is being improperly shared, which is contributing to retaliation, harassment, and threats against me.

The camera footage will confirm that I was approached and did not engage.

This must stop immediately.

I am requesting:

- Immediate review of camera footage
- A response regarding how complaint and personal information is being disclosed
- Action taken to prevent further threats, harassment, and retaliation

I did not engage with this tenant. I was approached, threatened, and placed in an unsafe situation without cause.

I expect this matter to be addressed urgently.  So tenenat can threatened  violence go get  other men as she stated to f me up . This is now escalated

Sincerely,
Tammy Beckman
1219 Main Street
Buffalo, NY
beckmantammylynn@gmail.com


Sincerely,
Tammy Beckman
1219 Main Street
Buffalo, NY
[beckmantammylynn@gmail.com](mailto:beckmantammylynn@gmail.com)


**Jacqueline Lewis** <jlewis@belmonthousingwny.org>    Tue, Apr 21, 4:26 PM

to me, Nichelle, Brenda, Colleen, Jaime

Ms. Beckman –
This email is sent to acknowledge that your incident report has been received.  The matter will be further examined amongst all parties involved.

Thank you,
Jackee Lewis

**Jackee L. Lewis,** ARM, TCS, HSC, CFS
**Regional Property Manager**

*Belmont Housing Resources for WNY, Inc.*
*2393 Main Street, Buffalo, NY  14214*
*(716) 884-7791  x151  (716) 884-8026 fax*
*www.belmonthousingwny.org*

Tamora Lee <getthebuzz716@gmail.com>                    Mon, Dec 22,
                                                              2025,
                                                            5:08 PM

to Jacqueline, Nichelle


**I cannot sign a new lease until I receive all missing appendices, the required written notice of lease change, copies of all amendments, and updated safety and inspection documentation.**

**Given the ongoing safety work, unresolved complaints, and pending legal matters, I am exercising my right to review all required documents before signing. Once these are provided, I will review them with legal counsel.**

**I request a full lease containing all parts, appendices, and supporting documentation as stated above, before any lease execution.**

see lease

To: Belmont Housing Resources for WNY
Cc: Artspace Projects, Inc. – Asset Management and Board of Directors
Cc: Office of the President, Belmont Housing Resources for WNY

Dear Management and Board Members,

This letter serves as a **comprehensive formal notice** documenting a pattern of unresolved and escalating issues relating to my tenancy at Artspace Buffalo Lofts. These issues include **lease irregularities, retaliation, privacy violations, safety and habitability concerns, property damage, misrepresentation, selective enforcement of rules, and refusal to engage in good-faith resolution**, despite repeated written and certified notices.

I am also formally reiterating my request for a **board-level meeting** with the Belmont President and representatives of the Artspace Projects, Inc. Minnesota board. and missing info on lease

# 1. Tenancy Timeline and Lease Irregularities

I moved into Artspace Buffalo Lofts on **September 15, 2024**. Since that time, I have received **multiple, inconsistent lease documents**, including:

- A 2024 lease
- A 2025 lease delivered late
- Lease materials referenced for September 2025
- An October 31, 2025 notice stating that yet another full lease will be issued effective January 1, 2026

These documents **differ materially**, were not provided in a timely manner, and reference **appendices, addenda, and sections that were never provided**. I have also learned that **lease-related paperwork was executed in or around May 2025 first part i signed** , yet I was never given copy of new lease letter prior to change as well.

As a result, I have been unable to determine which lease terms govern my tenancy.

# 2. Missing Lease Documents and Required Notices

Despite repeated requests, I have not received:

- All appendices, addenda, amendments, and disclosures referenced in 2025 lease
- parts of and Copies of any paperwork, amendments, or certifications processed or signed in **May 2025**
- Proof of required written notice of lease changes
- The full list of changes referenced as ENC in the October 31, 2025 notice
- The complete **Sprinkler Disclosure** and **RPL §231-C Notice**
- The source or template from which lease language was copied
- All versions of the lease referenced for **May–June, September, and November 2025**

# 3. Rent Increase and Incomplete Disclosure

On **January 9, 2025**, I received notice of a rent increase effective June 1, 2025, citing Section 25E and Appendix A, Section 3A of my lease and approval by **NYS Homes and Community Renewal**.

However:

- The referenced lease sections and appendices were never provided
- I requested full documentation explaining the cost increase for my specific unit
- No such documentation was supplied

I am again requesting **all documentation relied upon for this increase**, including calculations and HCR approval records.

# 4. Fire, Sprinkler, and Building Safety Concerns

Lease materials state that fire and sprinkler inspections were completed in **March 2025**. However, **fire sprinkler work and related safety repairs have been ongoing for more than three weeks**, with contractors recently on site. as early as 730 am not 9am as stated.

I am requesting:

- Updated fire, sprinkler, elevator, plumbing, and building safety inspection reports
- Any violation notices issued in **2024–2025**
- Full lead inspection, clearance, and remediation documentation

Outdated or inaccurate safety disclosures are unacceptable.

# 5. Property Damage Caused by Building Systems

My unit sustained significant damage due to a **hot water tank failure**, which flooded my apartment  storage room and damaged personal property, products, and critical paperwork.

Despite repeated written and certified notices:

- I never received a written acknowledgment or denial of liability
- No explanation was provided for refusal to compensate
- I was forced to file a **Small Claims Court action**
- **No representative of Artspace Projects, Inc. appeared in court**

The matter was adjourned, and no written response has ever been issued. Damage caused by building systems is **not the responsibility of renter's insurance**.

# 6. Retaliation, Privacy Violations, and Defamation

After raising complaints and filing claims, I experienced **retaliation and discrimination,** including:

- Disclosure of my **personal information and my daughter's personal information** to other tenants
- False reports resulting in police and crisis/mental-health responses to my apartment in which i want all info on
- False statements made to police, crisis services, and others
- Defamatory statements regarding my character, conduct, and mental health

Belmont staff, who are not medical professionals, made or yet also delayed/ allegations regarding  harassment , domestic issues, smoking/fire hazards, and gun threats while ignoring legitimate tenant-reported safety concerns. Tenants have also alleged that staff allowed other tenants to view confidential records.

I am currently seeking legal remedies related to **retaliation, defamation, and privacy violations.**

# 7. Misrepresentation and Improper Statements

Belmont staff appeared in court and as if they would make statements regarding damages and liability **without witnessing the incident** and without proper authority or factual basis. i I would like a letter of statement on the incident.

Additionally, attorney **Colleen Gillian** appeared to act on behalf of Artspace at meetings yet stated in court that she does **not** represent Artspace Projects, Inc minnesota, I also set letter to office requesting letter of representation in which she gave no response. This conflicts with Artspace documentation stating that Artspace oversees property operations and asset management.

Please clarify in writing:

- Who represents **Belmont Housing Resources for WNY**
- Who represents **Artspace Projects, Inc. buffalo and minnesota**
- Who has authority to speak on behalf of each entity in court and official proceedings

# 8. City Hall Meeting and Due-Process Concerns

I was notified on **September 24, 2025** that a scheduled meeting was replaced with a **City Hall meeting on October 3, 2025.** At that meeting:

- I was placed in a separate room
- My ability to speak was limited
- The meeting functioned as mediation of issues I expressed beyond just the water damages

Because the **City of Buffalo and/or BURA are on the deed and involved in inspections**, this raises serious conflict-of-interest and due-process concerns. i requested 3rd party

# 9. Selective Enforcement and Business Operations

The lease states that tenants may not operate businesses from their units. However:

- Multiple tenants operate full businesses
- A **hair salon** operates on site

I have requested zoning approvals/inspections, chemical use and disposal procedures, and health-and-safety protections for residents. No information has been provided. Selective enforcement of lease provisions is discriminatory and improper.

# 10. Resident Committees and Discriminatory Treatment

Artspace communications from 2024 state that resident committees are open, non-hierarchical, and allow equal participation. My experience reflects exclusion, restriction, and unequal treatment inconsistent with these policies.

# 11. Utility Data Release Request

I received a request to release my personal utility usage data despite electricity being tenant-paid. I requested clarification regarding purpose, use, retention, and voluntariness. No response has been provided.

# 12. Restricted Access to Management

After requesting a board-level meeting and submitting a **Notice of Claim**, I was informed that the site office is closed to walk-in access and operates by appointment only until further notice. This materially restricts tenant access to management during active disputes.

# 13. Hostile, Unprofessional, and Retaliatory Management Conduct

I am also documenting a pattern of hostile and unprofessional conduct by management, including:

- Sharing tenant complaints and personal grievances with other tenants, fueling gossip and intentional discord
- Discussing matters I raised in confidence in ways that caused confrontation
- Becoming argumentative when legitimate legal, safety, or lease issues were raised
- Hanging up on me during calls regarding unresolved matters
- Responding to complaints with unrelated statements about intelligence or credentials rather than addressing the issues

This conduct is inappropriate and retaliatory.

# 14. Request for Board-Level Meeting and Records

I formally request:

- A meeting with the **Belmont President and Board**
- A meeting with representatives of the **Artspace Projects, Inc. Minnesota board**

I also request, in writing:

- All records referencing me or my household
- All complaints, internal notes, emails, and reports
- All incident, inspection, and maintenance logs for **2024–2025**

# 15. Statement of Position

For clarity and preservation of rights:

I cannot sign any new or amended lease, consent to utility data release, or agree to further changes until all missing documents, accurate safety disclosures, inspection reports, rent-increase documentation, and written clarifications are provided.

Given the pattern of retaliation, privacy violations, unresolved property damage, selective enforcement, misrepresentation, restricted access to management, and pending legal matters, I am exercising my right to full review with legal counsel.

Please respond **in writing**. Verbal explanations, partial responses, or further deflection are insufficient.

. Unauthorized Business Operations, Selective Enforcement, and Health/Safety Risks

Artspace Buffalo Lofts' lease explicitly prohibits tenants from operating businesses from their apartments. Despite this:

1. Certain tenants operate full businesses on-site, including a **hair salon**.
2. This business generates **increased use of water, electricity, and heat**, potentially raising utility costs and strain on building systems.
3. The salon uses **chemicals** and other substances, creating potential **long-term health hazards** for residents. No documentation has been provided regarding **chemical safety, proper storage, or disposal**.
4. These practices create **unequal treatment**, as some residents are allowed to run businesses, while others are restricted. This selective enforcement appears arbitrary and discriminatory.
5. Allowing one tenant to operate a business while prohibiting others directly conflicts with lease provisions and raises **liability concerns** for Belmont Housing Resources and Artspace Projects, Inc.

I formally request:

- Written clarification of **zoning approvals, permits, and inspections** for all on-site businesses.
- Documentation on **health and safety protections**, chemical usage protocols, and long-term environmental monitoring.
- Assurance that lease terms are applied **consistently and equitably** to all tenants.

Until these matters are addressed, I **cannot consent to new lease terms, amendments, or occupancy changes**, and I reserve all legal rights regarding **retaliation, discrimination, and health/safety violations**.

## 16. Legal Misrepresentation and Lease Contradictions

1. **Lease Contradictions:**
   o The lease prohibits operating businesses from apartments. However, on-site businesses, including a hair salon, are allowed to operate without proper disclosure, zoning approval, or equitable application of rules.
   o This selective enforcement contradicts the lease, creates unequal treatment, and may expose Belmont Housing Resources and Artspace Projects, Inc. to legal liability.
2. **Attorney Misrepresentation:**
   o Attorney Colleen Gillian appeared at meetings, allegedly representing Artspace Projects, Inc., yet stated in court that she does **not represent Artspace Projects, Inc.**, creating **conflicting representations**.
   o Such misrepresentation is a **violation of professional responsibilities** and the **New York State Bar rules**, which require attorneys to accurately disclose whom they represent and to avoid misleading statements.
   o Misrepresentation by legal counsel undermines the integrity of meetings, court proceedings, and settlement discussions, and may expose the attorney to **disciplinary actions**.

I request written clarification and documentation:

- Confirm the **proper legal representation** for Belmont Housing Resources and Artspace Projects, Inc. in all official matters.
- Confirm that all future legal communications and meetings comply with **Bar requirements and ethical rules**.
- Clarify the **enforceability of lease terms** as they relate to business operations and selective enforcement.


# 17. Civil Liability and Accountability

- All actions or omissions by **management, tenants, or any other individuals** that cause harm, violate the lease, create unsafe conditions, or result in retaliation or discrimination may expose those responsible to **civil claims**.
- No individual, staff member, or entity is exempt from legal responsibility under **state, federal, or local law**, including but not limited to:
  o Personal injury or property damage
  o Retaliation, harassment, or discrimination
  o Breach of lease obligations
  o Misrepresentation or defamation
  o Privacy or HIPAA violations

- I reserve the right to **pursue civil remedies** against any party responsible for violations, harm, or misconduct, including **management personnel, tenants, and affiliated parties**.

**ADDENDUM: Artspace Mission, Ownership Structure, and Discrepancies in Practice**

This addendum is submitted to formally document discrepancies between **Artspace's publicly stated mission, ownership and deed structure, and leasing representations**, and the **actual conditions, restrictions, and practices experienced at Artspace Buffalo Lofts**.

## Artspace's Stated Mission and National Operations

Artspace represents itself as a national nonprofit organization dedicated to **affordable housing, community development, and support for artists**, operating in more than **20 states** with approximately **2,000 live/work units** and millions of square feet of community and commercial space. Artspace publicly states that it fulfills its mission through:

- Property development
- Asset stewardship
- Consulting services
- Donor-funded programs

Artspace further represents that it has evolved into a national organization based in the Twin Cities, with additional offices in **New York and Washington, D.C.**, and that its properties support **artists, creative communities, and inclusive access to shared resources**.

## Ownership, Deed, and Leasing Structure at Artspace Buffalo Lofts

Despite these representations:

- The **deed for Artspace Buffalo Lofts lists the City of Buffalo / BURA**, along with **Artspace Affordable Housing LP**, creating overlapping roles between owner, developer, inspector, and municipal authority.
- Leasing materials and communications identify **Belmont Housing Resources for WNY** as property management, with leasing conducted locally.
- Artspace Projects, Inc. is identified in official correspondence as responsible for **asset management and oversight**, yet has disclaimed representation in court proceedings.

This fragmented structure has resulted in **confusion, lack of accountability, and refusal by each entity to accept responsibility** when serious issues arise.

## Leasing Representations vs. Reality

Artspace Buffalo Lofts is marketed as offering:

- Studio, 1-, 2-, and 3-bedroom lofts
- Rental preference for persons involved in or committed to the arts
- Gallery and presentation areas for residents' work
- Community room
- Tenant association
- Shared workshop space
- Smoke-free environment
- Affordable housing with income limits

However, in practice:

- The **community room is closed or severely restricted**, with no written policy, schedule, governance structure, or equal-access framework.
- There is **no defined or transparent structure for artist participation**, exhibitions, fiscal sponsorship, or use of creative spaces.
- Access to shared spaces appears **selectively granted**, including exclusive use by certain tenant-run groups, contrary to Artspace's own published policies.
- Requests for clarification on community space governance and artist opportunities have been ignored or met with retaliation.

## Artist Preference and Equal Access Concerns

While leasing materials state that rental preference is extended to artists but does not exclude other income-eligible applicants, in practice:

- Statements have been made to me implying subjective judgments about who "looks like an artist."
- There are **no written standards** explaining how artist preference is applied, documented, or enforced.
- There is no transparent process for artists to access community resources, workshops, or exhibition opportunities.

This disconnect raises serious **fair housing, discrimination, and misrepresentation concerns**.

## Community Room and Tenant Association

Artspace materials promise:

# ARTSPACE BUFFALO ARTIST LOFTS APARTMENTS LEASE
## Housing Trust Fund/Low Income Housing Tax Credit Programs

1.  This is a residential lease between the owner (Landlord) of **Artspace Affordable Family Housing I, L.P.** and resident(s):___Tammy Beckman_____

2.  **PREMISES**
    The lease is for apartment # 508R  in the development known as Artspace Buffalo Lofts 1219 Main Street, Buffalo, New York 14209

3.  **LEASE TERM**
    This lease is for a one year term from  09/16/2024___  to  08/31/2025.

4.  **PERMITTED RESIDENTS**
    Except as otherwise permitted by law the resident agrees that it is a violation of the lease to permit any individuals other than those listed in this paragraph to reside in the premises. The resident further agrees not to assign this lease or sublease the premises to anyone else.

    The individuals to reside in the unit are:

    Tammy Beckman_____          _____

    Freedom Welch_____          _____

    _____          _____

    Any change of residents must be immediately reported to the landlord and will require a re-determination of eligibility as set forth in Appendix A.

5.  **ELIGIBILITY FOR BELOW MARKET RENT**
    The landlord is obligated by the NYS Housing Trust Fund Corporation to maintain the project for occupancy by Persons of Low Income.  The construction of the apartment was subsidized through the NYS Housing Trust Fund Corporation, the Federal and NYS Low Income Housing Tax Credit Programs, and the HOME Program. The rent paid by an eligible resident will be lower than the resident would have had to pay if the subsidy had not been provided. Resident agrees to provide correct information and any required documentation to the Landlord to determine resident's eligibility to reside in the premises at a below market rental rate pursuant to the requirements of the NYS Housing Trust Fund, the Low Income Housing Tax Credit (LIHTC) Programs, and the HOME Program.

    **Determination of eligibility will be made prior to initial occupancy and thereafter, yearly, on the anniversary date of occupancy. Resident agrees to provide any appropriate verification of the required information as requested by the Landlord.**

6.  **MONTHLY RENTAL PAYMENTS**
    Monthly rental payments in the amount of  $1084  ("Monthly Rent") will be due on the first day of each month. Monthly rent payments shall be paid to Artspace Affordable Family Housing, c/o Belmont Housing Resources for WNY, 1219 Main Street, Buffalo, New York 14209. Monthly rent includes payment for the following utilities/services:

**water /sewer, gas and garbage collection. The owner provides the stove and refrigerator.**
Payment for all other utilities and services are the responsibility of the Resident, including, but not limited to, electricity, telephone and cable TV. The monthly rent may be adjusted during this lease term as stated in Appendix A.

7.    **LEASE RENEWAL**
Forty five days prior to the end of the lease term, the landlord shall notify the resident as to whether or not landlord will offer the resident a new lease. In the event that the landlord fails to notify the resident, resident shall be entitled to remain in the unit under the same terms and conditions as are set forth in this lease until the landlord has fulfilled its obligation to give the resident forty five (45) days notice of whether or not resident will be offered a new lease.

8.    **TERMINATION OF LEASE BY RESIDENT**
A.    The resident understands that it is not the purpose of the security deposit to be used for the last month's rent.

B.    Resident may terminate this agreement prior to the end of the lease for good cause such as moving to another location for employment, loss of job, severe illness, death of spouse or other reasons customary or mandatory in the community. The resident must notify the landlord in writing at least thirty (30) days before intending to leave. If resident fails to give the notice required by this paragraph, and the unit has not been rented to another resident, the resident will have to pay the rent (and utilities) for the next month.

9.    **TERMINATION OF LEASE BY LANDLORD**
A.    Grounds for Termination. Any termination of this lease by the landlord must be carried out in accordance with state and local law, and the terms of this lease. The landlord may terminate this lease only for :

1)    Resident's material noncompliance with the terms of this lease.
2)    Resident's failure to carry out obligations under any state or local law or regulations.
3)    Other good cause.

B.    Material Noncompliance. Material noncompliance with the lease includes, but is not limited to:

1)    Nonpayment of rent or any other amount due under the lease; repeated late payment of rent.
2)    Illegal activity, including drug-related activity, on or near the premises by the resident, members of the household, or their guests.
3)    Serious or repeated interference with the rights and quiet enjoyment of other residents.
4)    Serious or repeated damage to the unit or common areas, or creation of physical hazards.
5)    Permitting unauthorized persons to live in the unit.
6)    Giving the landlord false information regarding income or other factors considered in determining the resident's rent payment or eligibility for residence in the premises, or failure to provide such information to the landlord upon request.

C.    **OTHER GOOD CAUSE**
1)    Other good cause for termination of the lease includes, but is not limited to, failure by the resident to accept the offer of a new lease.

D.    **UNLAWFUL OR CRIMINAL ACTIVITY**
The resident agrees that the resident and members of the household must not engage in or permit:

1)    Any criminal activity, including drug-related activity, and/or criminal activity involving illegal weapons in the unit or on the property.

2)    Any other unlawful activity.

The resident will be notified of violations of this paragraph. Violation of any of the provisions of this paragraph which do not cease within 10 days of such notice will result in termination of the lease. **No further notice or opportunity will be given to the resident prior to termination of this lease.**

10.    **VIOLATION OF LEASE TERMS - PROCEDURE**
A.    To terminate the lease, the landlord must give written notice to the resident, stating the date the lease will terminate and the reasons for the termination.

B.    In a termination for nonpayment of rent, notice will be in accordance with New York State Law.

C.    In a termination for unlawful or criminal activity, the notice of lease termination shall be for ten days, in accordance with paragraph 9(D).

D.    Except for cases of nonpayment of rent or unlawful or criminal activity, if the resident does not comply with the terms of the lease, the landlord will do the following:
1)    Send resident a written notice demanding that resident live up to the terms of the lease within 10 days; and

2)    If resident does not comply within that time, landlord will send resident a second written notice terminating the lease 30 days after the second notice is mailed to resident. On that day resident is to vacate the apartment and return the keys to the landlord. If resident does not vacate, landlord may start eviction proceedings within requirements of the New York State law.

E.    The notice of lease termination may be combined with, or run concurrently with, any notice required by State law.

11.    **SERVICES OF NOTICES**
Notices to resident: Any required notice from landlord to resident must be (A) personally delivered or (B) in writing, signed by or in the name of landlord or landlord's agent, and addressed to resident at the apartment and sent by certified mail to resident at the unit.

Notices to landlord: Resident will give all required notices to landlord in writing, delivered personally or sent by mail to landlord at the site office or at such other address as landlord may designate. It is suggested that the notice be sent by certified mail.

12.    **ATTORNEY FEES AND OTHER CHARGES - ADDITIONAL RENT**
In the event that landlord commences any legal action against the resident or retain an attorney to enforce any term of this lease including collection of rent or other charges, resident shall be responsible to landlord for the payment of all reasonable attorney fees as well as all

actual expenses incurred in connection therewith. Attorney fees, expenses, and all other charges or fees required under this paragraph as well as any other sections of this lease shall be considered additional rent and payable upon demand.

13. **ABANDONED PROPERTY**
Landlord shall notify resident of landlord's policy regarding the disposition of property left in the apartment or elsewhere on the premises after termination of this lease.

14. **SECURITY DEPOSIT AND REFUND POLICY**
It is agreed that Resident shall pay Landlord a security deposit of $ 1084 payable before taking possession of the apartment as security for resident's fulfillment of lease conditions and to be used as contingency against any damages to the apartment. Security deposits will be held in a resident bank account selected by the landlord. Any interest earned will be paid to the resident, less statutorily allowed handling and administration charges. In order to get a refund of the security deposit the resident must provide the landlord with a 30 day written notice of intent to move out. The landlord will hold this security deposit for the period the resident occupies the unit. After the resident has moved from the unit, the landlord will determine whether the resident is eligible for a refund of any or all of the security deposit. The amount of the refund will be determined under the following conditions and procedures:

A. . After the resident has moved from the unit, the landlord will inspect the unit and prepare a written report. The landlord will permit the resident to participate in the inspection if the resident so requests.

B. The landlord will refund to the resident the amount of the security deposit after deducting the following, as applicable:
1) Damages that are not due to normal wear and tear and are not listed on the "unit inspection report";
2) Unpaid charges for repairs, late payment of rent and returned checks;
3) Lock-related charges; and
4) Unpaid rent.

C. The landlord agrees to refund the amount due as soon as possible after the resident has vacated the unit. The landlord will also give the tenant a written list of charges that were subtracted from the deposit. If the resident disagrees with the landlord, the landlord agrees to meet with the resident and discuss the disputed charges.

D. If the unit is rented by more than one person, the residents agree that they will work out the details of dividing any refund among themselves. The landlord may pay the refund to the resident first identified in paragraph 4 of this lease.

15. **LATE FEES, RETURNED CHECK POLICY**
A. Late Payments and Returned Checks. In the event the resident shall fail to make any monthly payment of rent or additional rent on or before the first day of each calendar month, a "late charge" will be assessed each month until the rent is paid in full in accordance with the following schedule:

| | |
|---|---|
| After the fifth day of the month: | $5.00 Late Fee |
| After the sixth day: | $1.00 for each day that rental payment is delinquent |
| Not to Exceed: | $30.00 Late Fee Per Month |

In the event a resident's check is not honored for payment (bounces), the resident will be charged a fee. See Schedule of Charges.

All late charges and returned-check charges shall be considered additional rent.

B.    Application of Payments. Money paid by resident to landlord shall be applied to resident's account in the following order: first, to outstanding late charges and returned-check charges; second, to outstanding legal fees and/or court costs legally chargeable to resident; third, to outstanding utility bills; and, fourth, to rent.

## 16.    **OBLIGATIONS OF LANDLORD AND RESIDENT**
A.    The landlord agrees to:
1)    Regularly clean all common areas of the project;
2)    Maintain the common areas and facilities in a safe condition;
3)    Maintain all building systems and landlord provided equipment and appliances in a safe and working order;
4)    Make necessary repairs with reasonable promptness;
5)    Maintain outside lighting in good working order;
6)    Provide extermination services as necessary;
7)    Maintain the grounds and shrubs;
8)    Annually ensure that smoke detectors in the unit and common areas are in good working order; and
9)    Maintain the buildings and common areas in accordance with the local housing codes and regulations.

B.    The resident agrees to:
1)    Keep the unit clean and sanitary;
2)    Use all appliances, fixtures and equipment in a safe manner and only for the purposes of or which they are intended;
3)    Not litter the grounds or common areas of the project;
4)    Not destroy, deface, damage or remove any part of the unit, common areas or project grounds;
5)    Give landlord prompt notice of any defects in plumbing, fixtures, appliances, heating or cooling equipment or any other part of the unit or related facilities;
6)    Remove garbage and other waste from the unit in a clean and safe manner and dispose of it in the designated method;
7)    To fully cooperate with the landlord to achieve compliance with requirements for waste separation and recycling;
8)    Not leave children unsupervised;
9)    Not disturb the peaceable occupancy of others;
10)    Not give keys to individuals not residing in the unit without prior written approval of the Landlord;
11)    Not create any conditions on the premises which pose a threat to the health or safety of any person or persons.
12)    Not use the premises for any purpose deemed hazardous by insurance companies

carrying insurance thereon;

13)    To permit the landlord, or his/her agents, or any representative of any holder of a mortgage on the property, or when authorized by the landlord, the employees of any contractor, utility company, municipal agency or others, to enter the premises for the purpose of making reasonable inspections and repairs and replacements.

## 17.    **DAMAGES AND PROHIBITED ALTERATIONS**

A.    The landlord will make repairs to the apartment, its fixtures and equipment, which are necessary because of carelessness, misuse or neglect by the resident or his/her visitors.  The resident agrees to pay for the actual costs of said repairs within 30 days after receipt of the landlord's demand for payment.

B.    The resident agrees that the following alterations are prohibited without first obtaining the landlord's written permission:
1)    Change or removal of any part of the appliances, fixtures or equipment in the unit;
2)    Painting or installation of wallpaper or contact paper in the unit;
3)    Attachment of awnings or window guards in the unit;
4)    Attachment or placement of any fixtures, signs or fences on the building(s), the common areas or the project grounds;
5)    Attachment of any shelves, screen doors or other permanent improvements in the unit;
6)    Installation of washing machines, dishwashers, dryers, fans, freezers, heaters or air conditioners in the unit; or
7)    Placement of any aerials, antennas or other electrical connections on the unit.

## 18.    **RESIDENT'S USE OF PREMISES, RIGHTS OF OTHER RESIDENTS**

Resident agrees to use the premises solely as a private residence for the occupants and no other person or persons without the written consent of the owner.  Resident also agrees to use the premises and all common areas in accordance with the resident rules, a copy of which resident has received and which by this reference are made a part hereof, and further agrees not to violate any law or ordinance of any governmental authority with respect to the premises or any common areas.  Resident agrees to use good judgment and thoughtfulness for others in the use of apartment.  Resident further agrees not to commit, suffer, or permit any waste or nuisance in, on, or about the said premises, or in any way to annoy, molest, or interfere with any other resident or occupant, nor to use in a wasteful or unreasonable or hazardous manner any of the utilities furnished by the management.

## 19.    **REPAIR AFTER FIRE OR OTHER EVENT**

If the apartment is damaged by fire or other event, not the fault of the resident and cannot be lived in, the landlord shall have the right to repair and rehabilitate the building within a reasonable amount of time, or, shall have the right to terminate the lease.

## 20.    **LANDLORD'S RIGHT TO ENTER PREMISES**

The Landlord may enter the unit in the event of an emergency, or after advance notice and during reasonable hours; as part of a periodic inspection; as part of a preventive maintenance program; or to show the unit to prospective residents after the resident has given notice of intent to move.  The resident agrees not to install additional or different locks on any doors or windows of the unit without the written permission of the landlord.  If the landlord approves the resident's request to install such locks, the resident agrees to provide the landlord with a key for each lock.  When this lease ends, the resident agrees to return all keys to the dwelling unit to the landlord.  The landlord may charge the resident for lock-related charges in accordance

with the attachment "Schedule of Charges."

**Additional Rules**
The resident agrees that resident's family and guests will obey all house rules which are attached to this lease and any procedures outlined.  The resident agrees to obey additional rules established after the effective date of this lease if the rules are related to the safety, care and cleanliness of the building, and the safety, comfort and convenience of the residents, and if the resident received written notice of the proposed rule at least 30 days before the rule is enforced.

21. **USE**
The resident agrees not to use the premises for any purpose other than as a private residence. The resident further agrees not to assign this lease or sublease the premises to anyone else.

22. **SEPARATE REMEDY FOR ADDITIONAL CHARGES**
Landlord agrees to accept resident rental payments and to seek separate legal remedy for the collection of any other charges which may be payable to landlord by resident.

23. **ELDERLY AND DISABLED PERSONS, SPECIAL PROVISIONS**
Residents 60 years of age and older or residents subject to a disability as defined in the New York State Executive law, Article 15, Section 292, who have an executed lease agreement at the time that the property is sold, or any applicable governmental regulatory agreement or loan is terminated or repaid, shall be permitted to continue occupancy at a rate where total housing costs do not exceed 30 percent of their income, unless such residents are evicted for good cause in accordance with all applicable state laws.

24. **HOUSEHOLD SIZE**
Resident understands that the landlord will assign the units according to the size of the household in accordance with New York State Division of Housing And Community Renewal requirements of no more than two persons per bedroom and no more than two persons to a zero bedroom unit.  The landlord must offer the resident from among available units in the development a lease for a unit of appropriate size if a resident's household size increases or decreases so that it is within these guidelines.  Except as otherwise prohibited by law, resident's refusal to move into a unit of appropriate size when requested to do so would constitute good cause for termination of the lease and resident agrees to vacate the unit if requested to do so by the landlord.

25. **RESIDENT ASSURANCES**
The resident makes the following statements:

A. I agree I must immediately notify management when there is a change in my income or when there is a change in the number of persons living in the household.

B. I acknowledge that the premises are operated pursuant to the rules and regulations of the Federal Low Income Housing Tax Credit program (the "program").  The program provides for specific qualification restrictions with respect to occupancy of program units by full-time students.  I acknowledge that qualification to remain as a resident is at all times dependent upon the household meeting all student status requirements.  Should I fail to meet all student status requirements, I will be deemed an unqualified resident and will be subject to immediate eviction.  I agree to notify management immediately of any change in student status by any

member of the household.

C.    I understand that should I receive rental benefits to which I am not entitled due to my/our failure to provide information, or due to incorrect information provided by me or on my behalf by others or by any other household member, I will be required to make restitution and I agree to pay any amount of benefits to which I was not entitled.

D.    I understand that income certification is a requirement of occupancy and determination of eligibility and, when applicable, the monthly resident rent to be charged.

E.    I understand and agree that my monthly rent is the amount shown in paragraph 6 or adjusted pursuant to Appendix A and that, if my income increases above the maximum allowable income limit, my rent may be increased up to the lesser of the market rent or the maximum rent under the Low Income Housing Tax Credit Program.

F.    I agree that I shall provide the landlord a person(s) to contact in the event of death or emergency.

26.    **EFFECT OF SALE OF PREMISES**
The term of this lease shall continue in effect in the event that the premises are transferred to a new owner.

27.    **NO ORAL AMENDMENTS**
This lease may not be changed except by a written agreement signed by the landlord and the resident.

**SIGNATURES:**    The resident and the landlord have each received identical copies of the lease; each copy signed and dated by both landlord and resident.

_____          _____
Resident                                  Landlord

_____          Date
Resident
                                          9/16/2024
9/16/24
Date

**ATTACHMENTS:**    Appendix A:        Calculation of Rent Increase/Decrease
Appendix B:        NYS DHCR Exhibit D Summary of Resident Rights and Obligations
Attachment 1:      Tax Credit Program Addendum
Attachment II:     Resident Rules
Attachment III:    Low-Income Lease Rider
Attachment IV:     Smoke Free Addendum
Attachment V:      Schedule of Charges
Attachment VI:     Pet Rules and Regulations
Attachment VII:    Resident Handbook
Attachment VIII:   Crime Free Attachment
Attachment IX:     Motorized Wheelchair Attachment
Attachment X:      Assistance Animal Policy
Attachment XI:     Satellite Dish and Antenna Addendum

Attachment XII:      Live-in Aide Addendum
Attachment XIII:     Low Income Housing Credit Regulatory Agreement

# APPENDIX A
## CALCULATION OF RENT INCREASE/DECREASE

1.  **PURPOSE**
This Appendix sets forth how your monthly rent will be determined, and the circumstances under which your Monthly Rent set forth on page 1, #6 of your lease may increase or decrease.

2.  **BASIC FACTORS**
There are three basic factors which are used to calculate Monthly Rent:

**Basic Rent**
Basic Rent for the unit is $1084 . Basic Rent is the amount of rent necessary to pay the expenses of the project.

**Market Rent/LIHTC Rent Limit**
Market Rent for the apartment is $ 1964 . Market Rent is the amount of rent that would have to be charged if the Housing Trust Fund Corporation had not subsidized the development of your unit. If the operating expenses of the project increase Market Rent may be increased accordingly. The current LIHTC Rent limits are available from the Management Agent upon request. The maximum rent which the owner can charge under the LIHTC Program is based on housing unit size and 30% of the maximum area income limit.

**Resident's Household Income**
This is the combined income of all persons residing in the unit. The maximum income limits for the apartments are set at a percent of the area median income by household size, and are available upon request from the Management Agent

3.  **INCREASES IN RENT (AFTER 30 DAYS NOTICE)**
A.  Your Monthly rent may increase if Basic Rent increases due to increases in operating costs of the project that your unit is in. Your Monthly Rent will be the amount stated on page 1, #6 of the lease or Basic Rent, whichever is more.

B.  Your Monthly Rent may increase if your Household's Income increases but not unless your Household's Income increases above the eligibility income level. If your Household's Income exceeds eligibility requirements, your Monthly Rent will adjust to 30% of your Household's income (less an allowance for certain utilities you may pay for). Your Monthly Rent will not be increased above the lesser of the Market Rent or the LIHTC Maximum Rent.

C.  If you or any other member of your household is receiving a rent subsidy, and that rent subsidy increases, your rent may be increased accordingly at the discretion of the Landlord.

4.  **DECREASES IN RENT**
You are not entitled to deceases in rent based on decreases in income or decreases in rent subsidies; however, you should report such decreases to the Landlord. The Landlord may decrease your rent if:

A.  If any such rent subsidy you are receiving is decreased. Your Monthly Rent may be decreased accordingly at the discretion of the Landlord but will not be less than Basic Rent.

B.  If the Resident's income exceeded eligibility requirements and is subsequently reduced below eligibility requirements, your Monthly Rent may be decreased accordingly at the discretion of

the Landlord, but will not be less than the Basic Rent.

5. **IMMEDIATE INCREASE FOR FAILURE TO PROVIDE INFORMATION, FALSE INFORMATION**

If Resident fails to provide information, or falsifies information required to be furnished to the Landlord under this lease, rent will immediately increase to the lesser of the Market Rent or the LIHTC Maximum Rent. Resident further understands that he/she will be required to pay the difference between rent paid and the Market Rent or LIHTC Maximum Rent if incomplete or false information was previously supplied.

## TURNKEY/HOUSING TRUST FUND LEASE

**Artspace Affordable Housing, LP**

1.      This is a residential lease between the owner (Landlord) of 1219 Main Street, Buffalo NY 14209 (address) and Tenant(s) Tammy Beckman

2.   **PREMISES**
The lease is for apartment #508 in the project known as  Artspace Buffalo Lofts, Buffalo, New York.

3.   **LEASE TERM**
The tenant may choose a lease with a term of one or two years.  This lease is from 9/1/2025 to 8/31/2026

4.   **PERMITTED RESIDENTS**
Except as otherwise permitted by law the tenant agrees that it is a violation of the lease to permit any individuals other than those listed in this paragraph to reside in the premises.  Subletting is not allowed without prior written consent of the owner in accordance with NYS Housing Trust Fund Corporation policies.

The individuals to reside in the unit are:

Tammy Beckman

Freedom Welch

Any change of residents must be immediately reported to the Landlord and will require a redetermination of eligibility as set forth in Appendix A.

5.   **ELIGIBILITY FOR BELOW MARKET RENT**
The Landlord is obligated by the NYS Housing Trust Fund Corporation to maintain the project for occupancy by Persons of Low Income.  The construction of the apartment was subsidized by the State of New York through the NYS Housing Trust Fund Corporation. The rent paid by an eligible tenant will be lower than the tenant would have had to pay if the subsidy had not been provided.  Tenant agrees to provide correct information and any required documentation to the Landlord regarding tenant's household income, household composition and any other items necessary for Landlord to determine tenant's eligibility to reside in the premises at a below market rental rate pursuant to the requirements of NYS Low Income Housing Trust Fund Program.

Determination of eligibility will be made prior to initial occupancy and thereafter, yearly on the anniversary date of occupancy. Tenant agrees to provide any appropriate verification of the required information as requested by the Landlord.

6.   **MONTHLY RENTAL PAYMENTS, CALCULATION**
Monthly rental payments in the amount of $1175 "(Monthly Rent") will be due on the first day of each month. Monthly Rent payments shall be paid to Artspace Buffalo Lofts, Buffalo New York. (address) 1219 Main Street, Buffalo, New York 14209.

Lease for project units with Turnkey/HTFC Funding Rev (11/23)

Monthly rent includes payment for the following utilities:

Water, Sewer and Gas

Monthly rent includes payment for the following services:

Snow removal, trash removal, grounds keeping & landscaping

Payment for all other utilities and services are the responsibility of the tenant, including, but not limited to telephone, and cable TV. The monthly rent may be adjusted during this lease term as stated in Appendix A.

**7.     LEASE RENEWAL**
Sixty days prior to the end of the term of this lease for tenants in occupancy less than 2 years, or ninety days for tenant in occupancy over two years the Landlord shall offer the tenant a new lease. The tenant may choose a one- or two-year lease term. In the event that the landlord fails to offer the tenant a new lease, tenant shall be entitled to stay in the unit under the same terms and conditions as are set forth in this lease until the landlord has fulfilled its obligation to give the tenant the required notice of tenant's opportunity to sign a new lease.

**8.     TERMINATION OF TENANCY**
A.     The tenant understands that it is not the purpose of the security deposit to be used for the last month's rent.

B.     Tenant may terminate this agreement prior to the end of the lease for good cause such as moving to another location for employment, loss of job, severe illness, death of spouse, or other reasons customary or mandatory in the community, or as provided in law. The Tenant must notify the Landlord in writing at least thirty (30) days before intending to leave, or tenant will have to pay the rent (and utilities) for the next month unless the unit is re-rented.

C.     Any termination of this lease by the Landlord must be carried out in accordance with state and local law, and the terms of this lease. The Landlord may terminate this lease only for:

1)     Tenant's material noncompliance with the terms of this lease, such as (but not limited to): nonpayment of rent, repeated late payment of rent, illegal activities, permitting unauthorized persons to live in the unit, serious or repeated damage to the unit or common areas, creation of physical hazards, serious or repeated interference with the rights and quiet enjoyment of other tenants, and giving the Landlord false information regarding income or other factors considered in determining the tenant's rent payment or eligibility for residence in the premises, or failure to provide such information to the landlord upon request.
2)     Tenant's failure to carry out obligations under any state or local law or regulations;
3)     Other good cause.

**9.     VIOLATION OF TERMS OF LEASE - PROCEDURE**
Except as provided in paragraph **20**, if tenant does not comply with the terms of the lease except in the cases of nonpayment of rent, Landlord will do the following:

Lease for project units with Turnkey/HTFC Funding Rev (11/23)

A.     Send tenant a written notice demanding that tenant live up to the terms of the lease within 10 days (or 15 days if the notice is served by mail); and

B.     If tenant does not comply within that time, Landlord will send tenant a second written notice terminating the lease 30 days after the second notice is mailed to tenant. On that day tenant is to vacate the apartment and return the keys to the Landlord. If tenant does not vacate, Landlord may start eviction proceedings within requirements of the New York State law.

## 10.    ABANDONED PROPERTY

Landlord shall notify Tenant of Landlords policy regarding the disposition of property left in the apartment or elsewhere on the premises after termination of this lease.

*Same as old lease*

## 11.    SECURITY DEPOSIT AND REFUND POLICY

The tenant shall pay Landlord $1084 as a security deposit, not to exceed one month's rent. Security deposits will be held in a tenant bank account selected by the Landlord. Any interest earned will be paid to the tenant, less statutorily allowed handling and administration charges, not to exceed 1% of the security deposit. The Landlord will hold this security deposit for the period the tenant occupies the unit. After the tenant has moved from the unit, the Landlord will determine whether the tenant is eligible for a refund of any or all of the security deposit. The amount of the refund will be determined under the following conditions and procedures:

A.     Unless the tenant terminates the tenancy with less than two weeks' notice, the Landlord will inspect the unit between 1 and 2 weeks before move out and prepare a written report. The Landlord will permit the tenant to participate in the inspection if the tenant so requests and shall provide the tenant with at least 48 hours written notice of the date and time of the inspection.

B.     The Landlord will refund to the tenant the amount of the security deposit after deducting the following, as applicable:

1)     Damages that are not due to normal wear and tear and are not listed on the "unit inspection report"; and
2)     Unpaid rent.

C.     The Landlord agrees to refund the amount due within 14 days after the tenant has vacated the unit. The Landlord will also give the tenant a written list of charges that were subtracted from the deposit. If the tenant disagrees with the Landlord, the Landlord agrees to meet with the tenant and discuss the disputed charges.

D.     If the unit is rented by more than one person, the tenants agree that they will work out the details of dividing any refund among themselves. The Landlord may pay the refund to the tenant first identified in paragraph 4 of this lease.

## 12.    LATE FEES, RETURNED CHECK POLICY

There will be a late fee of $ 5.00 or any payment made after the fifth of any month. Fees are limited to $50 or 5% of the monthly rent, whichever is less. Any late fee, payment or charge shall not be considered additional rent. The Landlord may collect a $15.00 administrative fee plus bank charges on any check not honored for payment. After the second occurrence, the Landlord may require payment in a form other than a personal check. Extra charges will be due immediately.

## 13.    OBLIGATIONS OF LANDLORD AND TENANT

A.  The Landlord agrees to:

1) Regularly clean all common areas of the project;
2) Maintain the common areas and facilities in a safe condition;
3) Maintain all building systems and Landlord provided equipment and appliances in a safe and working order;
4) Make necessary repairs with reasonable promptness;
5) Maintain outside lighting in good working order;
6) Provide extermination services as necessary;
7) Maintain the grounds and shrubs;
8) Annually ensure that smoke detectors in the unit and common areas are in good working order; and
9) Maintain the buildings and common areas in accordance with the local housing codes and regulations.

B.  The tenant agrees to:

1) Keep the unit clean and sanitary;
2) Use all appliances, fixtures, and equipment in a safe manner and only for the purposes for which they are intended;
3) Not litter the grounds or common areas of the project;
4) Not destroy, deface, damage, or remove any part of the unit, common areas or project grounds;
5) Give the Landlord prompt notice of any defects in plumbing, fixtures, appliances, heating or cooling equipment or any other part of the unit or related facilities;
6) Remove garbage and other waste from the unit in a clean and safe manner and dispose of it in the designated method;
7) To fully cooperate with the Landlord to achieve compliance with requirements for waste separation and recycling;
8) Not leave children unsupervised;
9) Not disturb the peaceable occupancy of others;
10) Not give keys to individuals not residing in the unit without prior written approval of the Landlord; and
11) Not create any conditions on the premises which pose a threat to the health or safety of any person or persons.

## 14.    DAMAGES AND PROHIBITED ALTERATIONS

A. The Landlord will make repairs to the apartment, its fixtures and equipment, which are necessary because of carelessness, misuse or neglect by the tenant or his/her visitors. The tenant agrees to pay for the actual costs of said repairs within 30 days after receipt of the Landlord's demand for payment.

B. The tenant agrees that the following alterations are prohibited without first obtaining the Landlord's written permission:

1) Change or removal of any part of the appliances, fixtures, or equipment in the unit;
2) Painting, or installation of wallpaper or contact paper in the unit;
3) Attachment of awnings or window guards in the unit;
4) Attachment or placement of any fixtures, signs, or fences on the building(s), the common areas or the project grounds;
5) Attachment of any shelves, screen doors or other permanent improvements in the unit;
6) Installation of washingmachines, dishwashers, dryers, fans, freezers, heaters, or air conditioners in the unit; or
7) Placement of any aerials, antennas, or other electrical connections on the unit.

## 15. TENANTS USE OF PREMISES, RIGHTS OF OTHER TENANTS

The tenant agrees that the apartment will be used only to live in, and that the apartment is tenant's primary residence and will not be used as a place of business. The tenant may not use the apartment to conduct illegal activity. The tenant agrees not to damage the apartment, the building, the grounds, or the common areas, or to interfere with the rights of other tenants to live in their apartments in peace and quiet. Landlord agrees to do nothing which would prevent or interfere with tenant's legal use of the apartment.

## 16. REPAIR AFTER FIRE OR OTHER EVENT

If the apartment is damaged by fire or other event, not the fault of the tenant and cannot be lived in, the Landlord shall have the right to repair and rehabilitate the building within a reasonable amount of time or shall have the right to terminate the lease.

## 17. LANDLORD'S RIGHT TO ENTER PREMISES

The landlord may enter the unit in the event of an emergency, or after advance notice and during reasonable hours: as part of a periodic inspection; as part of a preventive maintenance program; or to show the unit to prospective tenants after the tenant has given notice of intent to move. The tenant agrees not to install additional or different locks on any doors or windows of the unit without the written permission of the Landlord. If the Landlord approves the tenant's request to install such locks, the tenant agrees to provide the Landlord with a key for each lock. When this lease ends, the tenant agrees to return all keys to the dwelling unit to the Landlord. The Landlord may charge the tenant for lock-related charges in accordance with the attachment "schedule of charges".

## 18. ADDITIONAL RULES

The tenant agrees that tenant's family and guests will obey all house rules which are attached to this lease and any procedures outlined. The tenant agrees to obey additional rules established after the effective date of this lease if the rules are related to the safety, care and cleanliness of the building, and the safety, comfort and

Lease for project units with Turnkey/HTFC Funding Rev (11/23)

convenience of the tenants, and if the tenant received written notice of the proposed rule at least 30 days before the rule is enforced.

## 19.    SEPARATE REMEDY FOR ADDITIONAL CHARGES

Owner agrees to accept tenant rental payments and to seek separate legal remedy for the collection of any other charges which may be payable to owner by tenant.

## 20.    GOOD CAUSE TO TERMINATE LEASE

The tenant will be notified of violations of this paragraph. Such notification and any subsequent legal proceedings will comply with New York State law. Violation of any provisions of this paragraph may result in termination of the lease pursuant to any procedures set forth in New York State law.

The tenant agrees that the tenant and members of the household must not engage in or permit:

1)    Any criminal activity, including drug-related criminal activity, and/or criminal activity involving illegal weapons in the unit or on the property.
2)    Any physical, violent act against building, employees, staff, or tenants.
3)    Any other unlawful activity.

## 21.    NOTICES

Notices to tenant: Any required notice from Landlord to tenant must be (A) personally delivered or (B) in writing, (1) signed by or in the name of Landlord or Landlord's agent, and (2) addressed to tenant at the apartment and sent by certified mail to tenant at the unit and provided in accordance with the law.
Notices to Landlord: Tenant will give all required notices to Landlord in writing, delivered personally or sent by mail to Landlord at 1219 Main Street, Buffalo New York 14209 or at such other address as Landlord may designate. It is suggested that the notice be sent by certified mail.

## 22.    ELDERLY AND DISABLED PERSONS, SPECIAL PROVISIONS

Tenants 60 years of age and older or tenants subject to a disability as defined in the New York State Executive law, Article 15, Section 292, who have an executed lease agreement at the time that the property is sold, or any applicable governmental regulatory agreement or loan is terminated or repaid, shall be permitted to continue occupancy at a rate where total housing costs do not exceed 30 percent of their income, unless such tenants are evicted for good cause in accordance with all applicable state laws.

## 23.    HOUSEHOLD SIZE

Tenant understands that the Landlord will assign the units according to the size of the household in accordance with New York State Division of Housing and Community Renewal occupancy requirements. The Landlord must offer the tenant from among available units in the development a lease for a unit of appropriate size if a tenant's household size increases or decreases so that it is not within these guidelines. Except as otherwise prohibited by law, tenant's refusal to move into a unit of appropriate size when requested to do so would constitute good cause for termination of the lease and tenant agrees to vacate the unit if requested to do so by the Landlord.

## 24. TENANT ASSURANCES

The tenant makes the following statements:

A. I understand that if there is a significant decrease in household income, I may request a rent decrease from the Landlord.

B. I understand that should I receive rental benefits to which I am not entitled due to my/our failure to provide information, or due to incorrect information provided by me or on my behalf by others or by any other household member, I will be required to make restitution and I agree to pay any amount of benefits to which I was not entitled.

C. I agree to promptly provide any certificates and income verifications required by the Landlord to permit determination of eligibility and, when applicable, the monthly tenant rent to be charged. I understand failure to do so will constitute a breach of the lease.

D. I understand and agree that my monthly rent is the amount shown in paragraph 6 or adjusted pursuant to Appendix A and may increase up to market rent as my income increases.

E. I agree that I shall provide the Landlord a person(s) to contact in the event of death or emergency.

## 25. EFFECT OF SALE OF PREMISES

The terms of this lease shall continue in effect in the event that the premises are transferred to a new owner.

## 26. NO ORAL AMENDMENTS

This Lease may not be changed except by a written agreement signed by the Landlord and the Tenant.

## 27. RENT STABILIZATION RIDER

The Landlord and the Tenant agree to execute a rent stabilization rider as approved by the HTF if the apartment becomes subject to the terms of the Rent Stabilization Law.


**SIGNATURES:**      **The Tenant and the Landlord have each received identical copies of the lease; each copy signed and dated by both Landlord and Tenant.**


_____        _____
TENANT                                   LANDLORD

_____        _____
TENANT

_____        _____
DATE                                     DATE

Lease for project units with Turnkey/HTFC Funding Rev (11/23)

## ATTACHMENTS:

APPENDIX A

EXHIBIT D SUMMARY OF TENANT RIGHTS AND OBLIGATIONS (FOR LIHC PROPERTIES)

HOUSE RULES AND REGULATIONS PET

POLICY/RULES (IF APPLICABLE)

APARTMENT INSPECTION

VAWA

SMOKE FREE HOUSING POLICY

SPRINKLER DISCLOSURE RIDER

WINDOW GUARDS (IF APPLICABLE)


missing some of the appendix listed too

**APPENDIX A**

1.    **PURPOSE**
This Appendix sets forth how your monthly rent will be determined, and the circumstances under which your Monthly Rent set forth on page 1, #6 of your lease may increase or decrease.

2.    **BASIC FACTORS**
There are four basic factors which are used to calculate Monthly Rent:

**Basic Rent**

Basic Rent for the unit is $ 1175  Basic Rent is the amount of rent necessary to pay the expenses of the project.

**Market Rent**

Market Rent is the amount of rent that would have to be charged if the Housing Trust Fund Corporation had not subsidized the development of your unit. Market rent shall apply to households that do not qualify as persons of low income pursuant to the requirements of NYS Low Income Housing Trust Fund Program. In any event, the rent charged shall not exceed the lesser of 30% of the tenant's income, or the market rent.

**Tenant's Household Income**

This is the combined income of all persons residing in the unit.

**Shelter Allowance**

Shelter Allowance is the amount that the local Department of Social Services will pay for rent.    *Added*

3.    **INCREASES IN RENT**
A.    Unless your Monthly Rent is based on Shelter Allowance, Your Monthly Rent may increase if Basic Rent increases due to increases in operating costs of the project that your unit is in. Your Monthly Rent will be the amount stated on page 1, #6 of the lease or Basic Rent, whichever is more.  *I asked for this*

B.    Your Monthly Rent may increase if your Household's Income increases but not unless your Household's Income increases above public assistance level. If your Household's Income increases, your Monthly Rent will adjust to 30% of your Household's income (less an allowance for certain utilities you may pay for). Your Monthly Rent will not be increased above Market Rent but will not be less than Basic Rent.

C.    If your Monthly Rent is based on the Shelter Allowance, and the Shelter Allowance is increased, Monthly Rent will be increased to the new Shelter Allowance amount.

D.    If you or any member of your household is receiving a rent subsidy, and that rent subsidy increases, your

Lease for project units with Turnkey/HTFC Funding Rev (11/23)

**This request remains outstanding.**

As previously stated, ongoing emails, letters, and calls are a direct result of lack of response. If there is a desire to reduce communication volume, the solution is straightforward: respond, follow established procedures, and engage in good-faith discussion.

This matter could have been resolved efficiently had proper communication and procedures been followed. Instead, continued lack of response has required ongoing documentation on my part.

Please provide:

1. Clarification on protocol for interacting with service providers in tenant units
2. Explanation for redirecting National Grid to the office in this instance
3. Status of my request for a formal meeting

I expect a timely and professional response.

Sincerely,
**Tammy Beckman**


# Threats of violence
**Inbox**

**Tamora Lee** <getthebuzz716@gmail.com>                    Tue, Apr 21, 4:16 PM

to Nichelle, Brenda, Jacqueline, Colleen, Jaime

To: Property Management / Nichelle

Requesting camera back you will see her approach me . Is this ok I dont even know her also I was actually cleaning up the back see pic before after as well guys. I never engaged with this lady her walking up to me threatening me is out of line and is cause for immediate police. In which I am doing a report . Nichelle need to stop reporting names who made complaints as her son stated he was told I said they did it . No one but nichelle is here correct . How would they know about emails.

I am submitting this as a formal and supplemental complaint to document ongoing threats of violence, harassment, retaliation, and the creation of a hostile and unsafe living environment.

In addition to my prior reports, I must formally state that I believe I am being retaliated against for engaging in protected activity, including reporting housing concerns and potential civil rights violations through proper channels.

Since making these reports, multiple tenants have approached me aggressively and/or made statements indicating they have been told that I am "reporting" or "blaming" them. This is false. I have never identified or confronted any tenant. All concerns have been submitted privately and professionally to management only.

This improper sharing or discussion of my complaints has created a hostile environment and is directly contributing to escalating confrontations and threats against me.

During the most recent incident in the backyard, the tenant who approached me aggressively was then proceeded to go get  additional men threating me during the confrontation  she said she will get people to f me up . This behavior was intimidating and contributed to a threatening atmosphere.

The tenant made a direct verbal threat, stating: "I will get my people to f*** you up." This is an explicit threat of violence and is completely unacceptable.

I also have audio evidence of the tenant's son stating that his mother told him I accused them of spilling liquid on the stairs. This is untrue. While I did report a detergent spill, I did not identify any individual. Despite this, the son approached me in a confrontational and intimidating manner.

I was later informed that this tenant is the same individual who previously claimed her life was threatened by her son—the same son who has now approached me aggressively. This further raises concerns about ongoing instability and risk.

This pattern demonstrates:

* Retaliation following protected complaints
* Improper sharing or discussion of private complaint information
* Escalation into threats of violence
* Coordinated or group intimidation
* Creation of a hostile and unsafe living environment

I want to be clear: this situation is not acceptable. No tenant should be subjected to threats, intimidation, or retaliation for reporting legitimate concerns.

I am requesting immediate action:

* Review all security footage from the backyard and front entrance
* Formally document and address the threats of violence
* Investigate the improper disclosure or discussion of my complaints

\* Take immediate steps to ensure my safety and prevent further retaliation or harassment

I am preserving all evidence, including audio recordings, and will escalate this matter to the appropriate legal and regulatory authorities if it is not addressed promptly.

This is a serious safety and liability issue and requires immediate attention.

To: Property Management / Nichelle

I am requesting that you immediately review the security camera footage from the backyard. The footage will clearly show the tenant approaching me aggressively and initiating the confrontation. I did not engage with this individual at any time.

I want to be clear: I do not know this tenant. Her approaching me, making threats, and escalating the situation is completely unacceptable and creates a serious safety concern.

At the time of the incident, I was cleaning the backyard in preparation for Earth Day activities. I have before-and-after photos documenting this. I was not involved in any conflict and was simply maintaining the space.

This tenant's actions—including walking up to me, yelling, and making threats—are out of line and warrant immediate attention. Due to the severity of the situation, I am filing a police report.

Additionally, I am extremely concerned about how this tenant and her son knew about a complaint regarding a detergent spill. The son stated directly that his mother told him I accused them. This is false, and I never identified any tenant.

I also informed you that once I recognized the son, I realized this is the same tenant I had previously been told about—where information about me, including where I work, had already been shared before I had ever interacted with them. This raises serious concerns about ongoing disclosure of my personal and complaint-related information.

This raises a serious question: how are tenants being told who is making complaints and given personal information? To my knowledge, only management has access to these communications. Therefore, there is a strong concern that this information is being improperly shared, which is contributing to retaliation, harassment, and threats against me.

The camera footage will confirm that I was approached and did not engage.

This must stop immediately.

I am requesting:

- Immediate review of camera footage
- A response regarding how complaint and personal information is being disclosed
- Action taken to prevent further threats, harassment, and retaliation

I did not engage with this tenant. I was approached, threatened, and placed in an unsafe situation without cause.

I expect this matter to be addressed urgently. So tenenat can threatened violence go get other men as she stated to f me up . This is now escalated

Sincerely,
Tammy Beckman
1219 Main Street
Buffalo, NY
beckmantammylynn@gmail.com

Sincerely,
Tammy Beckman
1219 Main Street
Buffalo, NY
[beckmantammylynn@gmail.com](mailto:beckmantammylynn@gmail.com)

**Jacqueline Lewis** <jlewis@belmonthousingwny.org>         Tue, Apr 21, 4:26 PM

to me, Nichelle, Brenda, Colleen, Jaime

Ms. Beckman –
This email is sent to acknowledge that your incident report has been received. The matter will be further examined amongst all parties involved.

Thank you,
Jackee Lewis

**Jackee L. Lewis,** ARM, TCS, HSC, CFS
**Regional Property Manager**

*Belmont Housing Resources for WNY, Inc.*
*2393 Main Street, Buffalo, NY 14214*
*(716) 884-7791 x151  (716) 884-8026 fax*
www.belmonthousingwny.org

Tamora Lee <getthebuzz716@gmail.com>

Mon, Dec 22,
2025,
5:08 PM

to Jacqueline, Nichelle

**I cannot sign a new lease until I receive all missing appendices, the required written notice of lease change, copies of all amendments, and updated safety and inspection documentation.**

**Given the ongoing safety work, unresolved complaints, and pending legal matters, I am exercising my right to review all required documents before signing. Once these are provided, I will review them with legal counsel.**

**I request a full lease containing all parts, appendices, and supporting documentation as stated above, before any lease execution.**

see lease

To: Belmont Housing Resources for WNY
Cc: Artspace Projects, Inc. – Asset Management and Board of Directors
Cc: Office of the President, Belmont Housing Resources for WNY

Dear Management and Board Members,

This letter serves as a **comprehensive formal notice** documenting a pattern of unresolved and escalating issues relating to my tenancy at Artspace Buffalo Lofts. These issues include **lease irregularities, retaliation, privacy violations, safety and habitability concerns, property damage, misrepresentation, selective enforcement of rules, and refusal to engage in good-faith resolution**, despite repeated written and certified notices.

I am also formally reiterating my request for a **board-level meeting** with the Belmont President and representatives of the Artspace Projects, Inc. Minnesota board. and missing info on lease

# 1. Tenancy Timeline and Lease Irregularities

I moved into Artspace Buffalo Lofts on **September 15, 2024**. Since that time, I have received **multiple, inconsistent lease documents**, including:

- A 2024 lease
- A 2025 lease delivered late
- Lease materials referenced for September 2025
- An October 31, 2025 notice stating that yet another full lease will be issued effective January 1, 2026

These documents **differ materially**, were not provided in a timely manner, and reference **appendices, addenda, and sections that were never provided**. I have also learned that **lease-related paperwork was executed in or around May 2025 first part i signed** , yet I was never given copy of new lease letter prior to change as well.

As a result, I have been unable to determine which lease terms govern my tenancy.

# 2. Missing Lease Documents and Required Notices

Despite repeated requests, I have not received:

- All appendices, addenda, amendments, and disclosures referenced in  2025 lease
- parts of and Copies of any paperwork, amendments, or certifications processed or signed in **May 2025**
- Proof of required written notice of lease changes
- The full list of changes referenced as ENC in the October 31, 2025 notice
- The complete **Sprinkler Disclosure** and **RPL §231-C Notice**
- The source or template from which lease language was copied
- All versions of the lease referenced for **May–June, September, and November 2025**

# 3. Rent Increase and Incomplete Disclosure

On **January 9, 2025**, I received notice of a rent increase effective June 1, 2025, citing Section 25E and Appendix A, Section 3A of my lease and approval by **NYS Homes and Community Renewal**.

However:

- The referenced lease sections and appendices were never provided
- I requested full documentation explaining the cost increase for my specific unit
- No such documentation was supplied

I am again requesting **all documentation relied upon for this increase**, including calculations and HCR approval records.

# 4. Fire, Sprinkler, and Building Safety Concerns

Lease materials state that fire and sprinkler inspections were completed in **March 2025.** However, **fire sprinkler work and related safety repairs have been ongoing for more than three weeks**, with contractors recently on site. as early as 730 am not 9am as stated.

I am requesting:

- Updated fire, sprinkler, elevator, plumbing, and building safety inspection reports
- Any violation notices issued in **2024–2025**
- Full lead inspection, clearance, and remediation documentation

Outdated or inaccurate safety disclosures are unacceptable.

# 5. Property Damage Caused by Building Systems

My unit sustained significant damage due to a **hot water tank failure**, which flooded my apartment  storage room and damaged personal property, products, and critical paperwork.

Despite repeated written and certified notices:

- I never received a written acknowledgment or denial of liability
- No explanation was provided for refusal to compensate
- I was forced to file a **Small Claims Court action**
- **No representative of Artspace Projects, Inc. appeared in court**

The matter was adjourned, and no written response has ever been issued. Damage caused by building systems is **not the responsibility of renter's insurance**.

# 6. Retaliation, Privacy Violations, and Defamation

After raising complaints and filing claims, I experienced **retaliation and discrimination,** including:

- Disclosure of my **personal information and my daughter's personal information** to other tenants
- False reports resulting in police and crisis/mental-health responses to my apartment in which i want all info on
- False statements made to police, crisis services, and others
- Defamatory statements regarding my character, conduct, and mental health

Belmont staff, who are not medical professionals, made or yet also delayed/ allegations regarding  harassment , domestic issues, smoking/fire hazards, and gun threats while ignoring legitimate tenant-reported safety concerns. Tenants have also alleged that staff allowed other tenants to view confidential records.

I am currently seeking legal remedies related to **retaliation, defamation, and privacy violations.**

# 7. Misrepresentation and Improper Statements

Belmont staff appeared in court and as if they would make statements regarding damages and liability **without witnessing the incident** and without proper authority or factual basis. i I would like a letter of statement on the incident.

Additionally, attorney **Colleen Gillian** appeared to act on behalf of Artspace at meetings yet stated in court that she does **not** represent Artspace Projects, Inc minnesota, I also set letter to office requesting letter of representation in which she gave no response. This conflicts with Artspace documentation stating that Artspace oversees property operations and asset management.

Please clarify in writing:

- Who represents **Belmont Housing Resources for WNY**
- Who represents **Artspace Projects, Inc. buffalo and minnesota**
- Who has authority to speak on behalf of each entity in court and official proceedings

# 8. City Hall Meeting and Due-Process Concerns

I was notified on **September 24, 2025** that a scheduled meeting was replaced with a **City Hall meeting on October 3, 2025.** At that meeting:

- I was placed in a separate room
- My ability to speak was limited
- The meeting functioned as mediation of issues I expressed beyond just the water damages

Because the **City of Buffalo and/or BURA are on the deed and involved in inspections**, this raises serious conflict-of-interest and due-process concerns. i requested 3rd party

# 9. Selective Enforcement and Business Operations

The lease states that tenants may not operate businesses from their units. However:

- Multiple tenants operate full businesses
- A **hair salon** operates on site

I have requested zoning approvals/inspections, chemical use and disposal procedures, and health-and-safety protections for residents. No information has been provided. Selective enforcement of lease provisions is discriminatory and improper.

# 10. Resident Committees and Discriminatory Treatment

Artspace communications from 2024 state that resident committees are open, non-hierarchical, and allow equal participation. My experience reflects exclusion, restriction, and unequal treatment inconsistent with these policies.

# 11. Utility Data Release Request

I received a request to release my personal utility usage data despite electricity being tenant-paid. I requested clarification regarding purpose, use, retention, and voluntariness. No response has been provided.

# 12. Restricted Access to Management

After requesting a board-level meeting and submitting a **Notice of Claim**, I was informed that the site office is closed to walk-in access and operates by appointment only until further notice. This materially restricts tenant access to management during active disputes.

# 13. Hostile, Unprofessional, and Retaliatory Management Conduct

I am also documenting a pattern of hostile and unprofessional conduct by management, including:

- Sharing tenant complaints and personal grievances with other tenants, fueling gossip and intentional discord
- Discussing matters I raised in confidence in ways that caused confrontation
- Becoming argumentative when legitimate legal, safety, or lease issues were raised
- Hanging up on me during calls regarding unresolved matters
- Responding to complaints with unrelated statements about intelligence or credentials rather than addressing the issues

This conduct is inappropriate and retaliatory.

# 14. Request for Board-Level Meeting and Records

I formally request:

- A meeting with the **Belmont President and Board**
- A meeting with representatives of the **Artspace Projects, Inc. Minnesota board**

I also request, in writing:

- All records referencing me or my household
- All complaints, internal notes, emails, and reports
- All incident, inspection, and maintenance logs for **2024–2025**

# 15. Statement of Position

For clarity and preservation of rights:

I cannot sign any new or amended lease, consent to utility data release, or agree to further changes until all missing documents, accurate safety disclosures, inspection reports, rent-increase documentation, and written clarifications are provided.

Given the pattern of retaliation, privacy violations, unresolved property damage, selective enforcement, misrepresentation, restricted access to management, and pending legal matters, I am exercising my right to full review with legal counsel.

Please respond **in writing**. Verbal explanations, partial responses, or further deflection are insufficient.

. Unauthorized Business Operations, Selective Enforcement, and Health/Safety Risks

Artspace Buffalo Lofts' lease explicitly prohibits tenants from operating businesses from their apartments. Despite this:

1. Certain tenants operate full businesses on-site, including a **hair salon**.
2. This business generates **increased use of water, electricity, and heat**, potentially raising utility costs and strain on building systems.
3. The salon uses **chemicals** and other substances, creating potential **long-term health hazards** for residents. No documentation has been provided regarding **chemical safety, proper storage, or disposal**.
4. These practices create **unequal treatment**, as some residents are allowed to run businesses, while others are restricted. This selective enforcement appears arbitrary and discriminatory.
5. Allowing one tenant to operate a business while prohibiting others directly conflicts with lease provisions and raises **liability concerns** for Belmont Housing Resources and Artspace Projects, Inc.

I formally request:

- Written clarification of **zoning approvals, permits, and inspections** for all on-site businesses.
- Documentation on **health and safety protections**, chemical usage protocols, and long-term environmental monitoring.
- Assurance that lease terms are applied **consistently and equitably** to all tenants.

Until these matters are addressed, I **cannot consent to new lease terms, amendments, or occupancy changes**, and I reserve all legal rights regarding **retaliation, discrimination, and health/safety violations**.

## 16. Legal Misrepresentation and Lease Contradictions

1. **Lease Contradictions:**
   - o The lease prohibits operating businesses from apartments. However, on-site businesses, including a hair salon, are allowed to operate without proper disclosure, zoning approval, or equitable application of rules.
   - o This selective enforcement contradicts the lease, creates unequal treatment, and may expose Belmont Housing Resources and Artspace Projects, Inc. to legal liability.
2. **Attorney Misrepresentation:**
   - o Attorney Colleen Gillian appeared at meetings, allegedly representing Artspace Projects, Inc., yet stated in court that she does **not represent Artspace Projects, Inc.**, creating **conflicting representations**.
   - o Such misrepresentation is a **violation of professional responsibilities** and the **New York State Bar rules**, which require attorneys to accurately disclose whom they represent and to avoid misleading statements.
   - o Misrepresentation by legal counsel undermines the integrity of meetings, court proceedings, and settlement discussions, and may expose the attorney to **disciplinary actions**.

I request written clarification and documentation:

- Confirm the **proper legal representation** for Belmont Housing Resources and Artspace Projects, Inc. in all official matters.
- Confirm that all future legal communications and meetings comply with **Bar requirements and ethical rules**.
- Clarify the **enforceability of lease terms** as they relate to business operations and selective enforcement.


## 17. Civil Liability and Accountability

- All actions or omissions by **management, tenants, or any other individuals** that cause harm, violate the lease, create unsafe conditions, or result in retaliation or discrimination may expose those responsible to **civil claims**.
- No individual, staff member, or entity is exempt from legal responsibility under **state, federal, or local law**, including but not limited to:
  - o Personal injury or property damage
  - o Retaliation, harassment, or discrimination
  - o Breach of lease obligations
  - o Misrepresentation or defamation
  - o Privacy or HIPAA violations

- I reserve the right to **pursue civil remedies** against any party responsible for violations, harm, or misconduct, including **management personnel, tenants, and affiliated parties**.

**ADDENDUM: Artspace Mission, Ownership Structure, and Discrepancies in Practice**

This addendum is submitted to formally document discrepancies between **Artspace's publicly stated mission, ownership and deed structure, and leasing representations**, and the **actual conditions, restrictions, and practices experienced at Artspace Buffalo Lofts**.

## Artspace's Stated Mission and National Operations

Artspace represents itself as a national nonprofit organization dedicated to **affordable housing, community development, and support for artists**, operating in more than **20 states** with approximately **2,000 live/work units** and millions of square feet of community and commercial space. Artspace publicly states that it fulfills its mission through:

- Property development
- Asset stewardship
- Consulting services
- Donor-funded programs

Artspace further represents that it has evolved into a national organization based in the Twin Cities, with additional offices in **New York and Washington, D.C.**, and that its properties support **artists, creative communities, and inclusive access to shared resources**.

## Ownership, Deed, and Leasing Structure at Artspace Buffalo Lofts

Despite these representations:

- The **deed for Artspace Buffalo Lofts lists the City of Buffalo / BURA**, along with **Artspace Affordable Housing LP**, creating overlapping roles between owner, developer, inspector, and municipal authority.
- Leasing materials and communications identify **Belmont Housing Resources for WNY** as property management, with leasing conducted locally.
- Artspace Projects, Inc. is identified in official correspondence as responsible for **asset management and oversight**, yet has disclaimed representation in court proceedings.

This fragmented structure has resulted in **confusion, lack of accountability, and refusal by each entity to accept responsibility** when serious issues arise.

## Leasing Representations vs. Reality

Artspace Buffalo Lofts is marketed as offering:

- Studio, 1-, 2-, and 3-bedroom lofts
- Rental preference for persons involved in or committed to the arts
- Gallery and presentation areas for residents' work
- Community room
- Tenant association
- Shared workshop space
- Smoke-free environment
- Affordable housing with income limits

However, in practice:

- The **community room is closed or severely restricted**, with no written policy, schedule, governance structure, or equal-access framework.
- There is **no defined or transparent structure for artist participation**, exhibitions, fiscal sponsorship, or use of creative spaces.
- Access to shared spaces appears **selectively granted**, including exclusive use by certain tenant-run groups, contrary to Artspace's own published policies.
- Requests for clarification on community space governance and artist opportunities have been ignored or met with retaliation.

## Artist Preference and Equal Access Concerns

While leasing materials state that rental preference is extended to artists but does not exclude other income-eligible applicants, in practice:

- Statements have been made to me implying subjective judgments about who "looks like an artist."
- There are **no written standards** explaining how artist preference is applied, documented, or enforced.
- There is no transparent process for artists to access community resources, workshops, or exhibition opportunities.

This disconnect raises serious **fair housing, discrimination, and misrepresentation concerns**.

## Community Room and Tenant Association

Artspace materials promise:

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NEW YORK

Tammy Beckman, individually and as parent and legal guardian of Freedom Welch,

Case No.: 26-CV-921

Pro Se Plaintiff(s),

v.

Artspace Affordable Family Housing, L.P.;

Artspace Affordable Family Housing GP, LLC;

Artspace Affordable Family Housing Development Fund Corporation;

Artspace Projects, Inc.;

Belmont Housing Resources for WNY, Inc.; Belmont Shelter Corporation;

City of Buffalo, including the Buffalo Police Department (BPD) and Behavioral Health Team (BHT), and John and Jane Does 1–10;

Buffalo Urban Renewal Agency (BURA);

Crisis Services, Inc.; Crisis Services Foundation, Inc.;

Erie County Democratic Committee; (ECDC)

Buffalo Special Investigations, LLC; Buffalo Special Investigations (BSI

Security);

Community Action Organization of Western New York, Inc. (CAO), including the

DART Program,

**SUPPLEMENTAL STATEMENT FOR JUDICIAL REVIEW**

**AND NOTICE OF ADDITIONAL EVIDENCE**

(Date: June 5, 2026)

To the Court and All Reviewing Authorities:

I respectfully submit this Supplemental Statement for Judicial Review and Notice

of Additional Evidence in connection with the above-captioned matter. This filing

supplements prior submissions made in 2025 and 2026 and is limited to newly

identified procedural, documentary, and evidentiary issues relevant to ongoing

judicial review.

---

## I. LIMITED NOTICE OF RELATED ADMINISTRATIVE REPORTING

Plaintiff has submitted or referenced complaints and notices to the following

agencies in connection with the underlying housing and procedural issues:

- U.S. Department of Justice (DOJ)

- New York State Attorney General

- U.S. Department of Housing and Urban Development (HUD OIG)

- Federal Bureau of Investigation (FBI)

- Department of Homeland Security (DHS)

- Internal Revenue Service (IRS)

- Congressional oversight offices

## II. COURT AND PROCEDURAL HISTORY (RELEVANT EVENTS)

**October 17, 2025**

- Counsel appeared late to a scheduled hearing.

- Proceedings were delayed despite Plaintiff's timely appearance.

- Plaintiff was not permitted to fully address the court.

**November 13, 2025**

- Adjournment granted at Defendant's request.

**February 17, 2026**

- Matter heard before Hearing Officer Jesse Pyle and Judge McDuffie.

- Plaintiff was limited in presenting statements and evidence.

- Case was dismissed without detailed findings on the record.

**Witness Issue Noted**

- Defense attempted to introduce maintenance/property personnel testimony.

- These individuals did not have firsthand knowledge of the flooding incident.

## III. CLERK / FILING HANDLING IRREGULARITY (REPORTED INCIDENT)

After refiling corrected documents:

- Filing was removed from intake window by court staff (Eric Johnson).

- Filing was taken to another floor.

- Plaintiff was later informed it was treated as a "motion."

- No written explanation or procedural clarification was provided.

## IV. REPRESENTATION OF COUNSEL (DOCUMENTED INCONSISTENCY)

**A. March 17, 2026 Court Appearance**

Attorney Jaime M. Cain appeared in court and indicated she was participating for certain defendant entities.

## B. April 8, 2026 Email (Cain) — Exhibit A

Counsel stated she had been newly retained that day and represented only Artspace Projects, Inc., and no affiliates.

## C. April 9, 2026 Email (Killian) — Exhibit B

Counsel stated she represented:

- Belmont Housing Resources for WNY, Inc.

- Artspace Affordable Family Housing I, L.P.

- Artspace Affordable Family Housing Development Fund Corporation

and directed communication to occur only in court.

## Issue Presented

These statements reflect inconsistencies regarding:

- Scope of representation

- Timing of retention

- Entity representation boundaries

## V. FAILURE TO COMMUNICATE / DISCLOSURE OF REPRESENTATION

From 2025 through 2026:

- Plaintiff requested clarification of counsel representation of entities

- No consistent written clarification was provided prior to court appearances

- No formal substitution notice was provided to Plaintiff

## VI. MUNICIPAL REPORTING AND SAFETY COMPLAINTS

Plaintiff submitted municipal service complaints including:

- Buff311 Police Issue Report No. 01352994 (1235 Main St)

- Housing/Building Violation Report No. 01353011 (1219 Main St)

- Buffalo Fire Department Complaint No. 01352962

These reflect ongoing notice of safety and housing concerns.

## VII. REQUEST FOR COURT ACTION

Plaintiff respectfully requests the Court:

1. Accept this Supplemental Statement into the record

2. Take judicial notice of procedural and documentation inconsistencies

3. Review representation disclosures for clarity in the record

4. Consolidate this filing with prior submissions for continuity of review

5. Consider additional fact-finding as necessary regarding filing handling and representation clarity

---

## DECLARATION

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

Dated: June 5, 2026

Tammy Beckman

Plaintiff Pro Se